Leo BROWN and John Lane, Individually and on behalf of all former hourly employees of Lakey Foundry Corporation who have accrued vested rights in the Lakey Foundry Corporation Pension Plan, Plaintiffs,

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), Defendant.

No. G185–73 CA6.

United States District Court,
W. D. Michigan, S. D.

April 8, 1981.

Arthur Rude, Muskegon, Mich., for plaintiffs.

A. Robert Kleiner, Grand Rapids, Mich., M. Jay Whitman, General Counsel for UAW, International Union, Detroit, Mich., for defendant.

## OPINION

DOUGLAS W. HILLMAN, District Judge.

Plaintiffs, former hourly employees of Lakey Foundry Corporation (hereinafter "Lakey"), bring this class action suit against defendant, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter "UAW"), for an alleged breach of defendant's duty of fair representation.

Throughout the 1960's, and until February 7, 1972, when Lakey petitioned for bankruptcy under Chapter XI of the former Bankruptcy Act, plaintiffs were members of UAW Local 403 with vested rights to benefits from the Lakey Foundry Corporation Pension Plan. That pension plan was managed, in part, by a Board of Administration of which defendant's agent, Victor Scott, was a member. Plaintiffs contend that when Lakey terminated operations in 1972, over $1,500,000 was owed to the fund by the company. Plaintiffs further contend that defendant, whose agent was a member of the Board of Administration, breached duties allegedly owed to its members by negligently failing to discover and remedy Lakey's default. Specifically, plaintiffs' fourth amendment complaint alleges defendant breached its statutory duty of fair representation owed to plaintiffs as union members, as well as state law obligations of fiduciary responsibility and contractual duties owed to plaintiffs as third-party beneficiaries of the pension plan, in that defendant:

(a) failed to require Lakey to comply with the requirements of the Pension Agreement for reporting on the status of assets and contributions to the pension fund;

(b) failed to ascertain that after the 1964 fiscal year an increasing deficit was accruing in the plan;

(c) failed to take action to insure that Lakey was maintaining its contribution obligations despite knowledge of Lakey's serious financial problems;

(d) failed to establish a procedure for routine review of either pension reports required to be filed by Lakey, or actuarial valuations received by the company;

(e) failed to detect the existence of a funding deficit even when copies of actuarial reports were received from Lakey;

(f) failed to pursue legal remedies against Lakey's officers and directors despite knowledge that defendant may have been defrauded by them; and

(g) failed to pursue legal remedies against the actuaries hired by Lakey despite knowledge that the actuaries may have submitted false or misleading reports.

Plaintiffs seek damages in the amount of the deficit in the fund.

Following this court's denial of defendant's motion to dismiss in September of 1980, the case was tried to the court in eight days during October, 1980. The parties presented 13 witnesses and 147 exhibits were received. The following opinion comprises the court's findings of fact and conclusions of law on these issues, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FACTS

Lakey Foundry Corporation for many years operated a grey-iron foundry in Muskegon, Michigan. In 1972, it ceased operations due to bankruptcy. The company was a major Muskegon employer, employing approximately 1,000 active hourly employees. Since 1941, these hourly employees were represented by the UAW and its Local 403.

*The International.*

The UAW is one of the oldest and largest labor organizations in the United States, and is headquartered in Detroit, Michigan. It is divided into 18 geographical regions, with each region additionally subdivided. Region 1–D is the geographical region roughly encompassing the western half of the State of Michigan, with headquarters located in Grand Rapids, Michigan. It is the region in which Local 403 was located. Each region of the UAW has a Regional Director, who is a member of the UAW's

International Executive Board, and who is elected by delegates from that region. The regional director's staff consists of "international representatives", or "service representatives", who are appointed by the UAW International President on the recommendation of the region's regional director. International representatives are assigned by the regional director to service one or more union locals, providing advice concerning handling of grievances, collective bargaining, organizing, etc. Each service representative is a UAW member who has arisen "from the ranks".

The International Union maintains three technical and professional departments (Research, Legal, and Social Security) designed to provide service representatives consultation concerning specialized problems. The Social Security Department has seven or eight staff members, two of whom are full-time actuaries. The department advises on matters concerning employee benefits, such as employee insurance and pensions, as well as occupational health and safety issues. Apparently, this is the largest union-maintained employee benefits consultation group in the country, and is the only one which retains a full-time actuary.

The UAW Social Security Department, in the period between 1962 and 1971, had service responsibility for approximately 1,500 pension plans. Each year, officers or representatives of several hundred of these plans contacted the department for advice, although a sizeable portion never did so. The Social Security Department never became involved in pension plan issues unless called upon by a regional director or local union member. Although it provided advice to locals concerning the drafting of new plans, it never assisted in the actual collective bargaining. The department was never a party to a newly-formed pension agreement.

Membership rules, procedures, regulations, rights and duties in the UAW are all governed by the UAW Constitution. Articles 32 and 33 of that Constitution, as adopted by the membership in April, 1970, provide a sophisticated intra-union procedure for complaining about actions or decisions of the International or one of its locals.[1] Before seeking relief from a civil court or governmental agency, an aggrieved member must first exhaust his or her internal union remedies, pursuant to Article 33, Section 13, which reads:

"Section 13. It shall be the duty of any member or subordinate body who feels aggrieved by any action, decision, or penalty imposed upon him or it, to exhaust his or its remedy and all appeals therefrom under the laws of this International Union prior to appealing to a civil court or governmental agency for redress."

It is undisputed that no member of the plaintiff class ever sought internal union relief concerning the union's alleged failure to supervise or monitor the Lakey pension fund.

The UAW Constitution further requires that newly-bargained agreements between employers and the union be signed by the regional director, and the Local's international representative, as well as by local officers and representatives of the employer. This is true even though the international representative and regional director have no role in the bargaining.

*Local 403.*

UAW locals are run by officers elected by a majority vote of the members. The local officers include a president, vice-president, secretary/treasurer, recording secretary, and sergeant-at-arms. Each local has a bargaining committee, usually with the local president as the chairman (although this was not the case with Local 403). There are also plant committees (stewards) and assorted standing committees, whose members either are appointed by the local president, or are elected by the local membership. At Local 403, the pension committee was a standing committee with two members appointed by the local president.

---

1. The UAW provision for intra-union remedies is considered by many to be a model. *See,* Note, "The Exhaustion of Intra-Union Procedures in Duty of Fair Representation Cases", 32 Rutgers L.Rev. 520, 537 (1979).

The international representative served as the third member of Local 403's pension committee, whose presence was at the request of the local president. Not every UAW local requests its international representative to sit on any of its committees.

*The Pension Plan.*

The Lakey Foundry Pension Plan was created in 1950 as part of that year's collective bargaining agreement, and thereafter, pursuant to the Pension Agreement signed by defendant, the local and the company, periodically was amended to provide greater benefits. The plan called for "defined benefits", whereby the employer is responsible for maintaining the plan fund at a level sufficient to guarantee each vested employee, upon retirement, a specific amount of pension per year until death. Many other types of pension plans, in contrast, provide employees, upon retirement, with only a lump sum or maximum amount of pension which, when expended, leaves the retiree without protection. Defined benefit plans place the risk of increased or unanticipated costs on the employer, thereby limiting risks of employees.

The Pension Plan and Pension Agreement provided for three bodies (viz., the Trustee, the Coordinating Committee and the Board of Administration) which administered and managed the plan and its trust fund. Under the terms of the plan, Lakey was to designate as Trustee a "bank, trust company or insurance company . . . to hold and invest the Trust Fund."[2] The Trustee was paid out of assets of the fund, and had full authority "to determine the forms of and to make the forms of investment for the Trust Fund," including investment in the company itself.

Lakey also had the right to select the members of a Coordinating Committee, the administrative body which retained "all powers as may be necessary to carry out the purposes of [the] Plan."[3] The Coordinating Committee consisted of from three to five members, and had the duty to make rules, establish policy, process applications for benefits, supervise the day-to-day administration of the plan, and appoint officers and actuaries necessary for the proper management of the trust fund.

The Pension Agreement signed by the company, the Local, and the International Union, implemented and regularly extended the plan. Under Paragraph 6(3) of this agreement, a Board of Administration was created whose duties included:

(a) receiving and analyzing reports on the assets, receipts, and disbursements of the trust fund;

(b) receiving an annual report from the Coordinating Committee on the operation and administration of the Plan;

(c) receiving an annual report of the expenditures for the administration of the Plan;

(d) evaluating and analyzing statistical and other data on the administration of the Agreement and the actuarial assumptions used in determining minimal contributions of the company; and

(e) causing to be prepared an annual report on the operation and administration of the Plan.

The Board of Administration consisted of six members, three appointed by Lakey, and three by the union. The three union members were always members of the local's pension committee, including the international representative. The Board of Administration existed as a supervisory body designed to protect employees' interests and to review Lakey's compliance with the plan.[4]

The Board was to meet ". . . at such times and for such periods for the transaction of necessary business . . .".[5] At meetings of the Board, the company's members were to have, in the aggregate, one vote to be cast on behalf of the employer, and the union's members were to have one vote to be cast on behalf of the union. In cases of a tie vote, an umpire was selected.

**2.** Article VII of the Plan.

**3.** Article IX of the Plan.

**4.** See paragraph 6 of the Pension Agreement.

**5.** Paragraph 6(1) of the Pension Agreement.

Despite the specific language of the plan, as a practical matter the day-to-day administration of the pension plan was performed by an insurance and personnel clerk in the company's personnel department. She maintained the plan's records, processed applications for benefits, and made the initial determination of benefit eligibility. Board approval of these determinations was received by circulating the benefit forms for the signatures of two of Lakey's three Board members, and the signatures of the two Local 403 members of the Board of Administration (since only two signatures were required for a quorum, the in-shop local members, rather than the international representative, regularly cast the union's vote).

In its many years of operation, the Board continuously failed to comply with the dictates of Paragraph 6(3) of the Agreement. The Board received no reports from the Coordinating Committee, nor did it ever evaluate or analyze statistical data concerning the administration of the plan. Over the years the Board seldom met. Instead, "minutes" were prepared by the employer and sent to the union members for signature.

Paragraph 6(4) of the Pension Agreement additionally provided in part, "the Board nor the Union, nor any officer or other representative of the Union, nor the Employer, nor any officer nor any actuary nor any other representative of the Employer, shall be liable because of any act or failure to act on the part of the Board, or any member thereof, to any person whatsoever, except that nothing herein shall be deemed to relieve any such individual from liability for his own fraud or bad faith."

Pursuant to the Lakey Plan, the company was obliged to pay enough money into the fund each year to insure that, upon retirement, each employee would receive until his death the full amount per year guaranteed under the plan. Technically, the company was obliged to "fully fund the costs of future service benefits" which accrued at the end of each plan year, and to "fund the past service deficiency ... on the basis of a level method of funding for a period of not over forty (40) years ...".[6]

"Future service benefits" and "past service deficiency" are terms of art in actuarial science instrumental in determining whether an employer is presently meeting its pension fund obligations. "Future service benefits" represent the amount an employer estimates it must pay each year to insure that its employees will fully receive the pension benefits guaranteed to them upon retirement, based on the employees' employment in the past year. Hence, with a new benefit plan, given a work force of employees who are many years from retirement, the amount the employer must have ready for disbursal when its employees are expected to retire is simply the accumulation of the annual "future service benefits" payments.

However, pension plans typically are not initiated only when workers are young and newly employed by a company. Instead, pension plans usually begin when some employees in the employer's workforce have been with the company for many years. These employees generally are immediately "vested", and receive full pension benefits upon retirement even though the employer has never before made a trust fund payment on their behalf. As a result, an employer must "catch up" by paying into the trust fund an amount above and beyond the annual "future service benefits". This extra amount contributed is the "past service deficiency".

In the Lakey case, the company had to make up this deficiency within forty years, and so the company's annual obligation to the fund was the year's "future service benefits" plus a percentage (simply speaking, approximately $\frac{1}{40}$th) of the "past service deficiency".

Although the plan called for Lakey to make irrevocable trust fund contributions

---

6. Paragraph 3 of page 4 of the Pension Agreement between Lakey and the union, dated March 2, 1959.

"from time to time",[7] Lakey's contributions were annual and followed the close of the plan fiscal year, which ran from November 1 to the following October 31. Beginning in plan year 1963–64, Lakey began its practice of regularly paying the pension contributions for a given plan fiscal year approximately six months after the close of that plan fiscal year on October 31. Prior to 1974, when Congress enacted the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., (hereinafter "ERISA") it was common practice for employers to delay their contributions to pension trust funds until after the close of the corporate fiscal year (which for Lakey was December 31) but before the corporate tax return was due (April 15 of the following corporate fiscal year). This was done because although the pension contribution would be attributed to the prior pension plan fiscal year, since the contribution was actually paid in the following corporate fiscal year, the contribution would be a deductible business expense in that later fiscal year. In other words, in Lakey's case, the pension contribution technically was due on October 31, at the close of the plan fiscal year. However, because Lakey made the contribution in the Spring of the following calendar year, Lakey was able to deduct the contribution in that corporate fiscal year beginning on January 1, even though the contribution was attributable to the plan fiscal year ending in the prior corporate fiscal year. As already stated, this was common practice prior to enactment of ERISA, by which employer pension plan practices became more greatly circumscribed. Lakey's delaying payment until the middle of the next plan fiscal year, according to witnesses at trial, neither violated the plan nor jeopardized plaintiffs' interests in their benefits.

As authorized under the pension plan, Lakey retained an actuary of its own choosing, A. S. Hansen, Inc. (hereinafter "Hansen"), to assist it in determining what amount was due at the end of each plan year. Hansen, like the Trustee, was paid out of the trust fund. Every year Hansen provided Lakey with two reports (cost requirement reports and actuarial valuations) intended to inform the company of the plan's financial status, and to advise Lakey what amount of contribution was due that year to keep the fund "current". These reports were necessary because under the plan, Lakey was not obliged to make a set annual contribution. Instead, Lakey's contribution schedule varied due to the plan's requirement that the company keep the trust fund sufficiently large to ensure that at the end of 40 years from the date the plan commenced, enough money was available to pay each employee the full amount of retirement benefits due to him (or, as one witness described it, Lakey was obliged to keep the fund "on track"). Because trust funds frequently increase in value, for example, due to investment profit, an employer need not pay into a trust fund the full amount that must be on hand when the employees later retire. Instead, an employer will pay into the fund only a portion of the amount it is expected will later be necessary, and this amount, it is anticipated, will appreciate at the hands of the Trustee.

The amount Hansen annually advised Lakey to contribute, then, resulted from this interpretation of the Pension Plan and from the use by Hansen of then-available actuarial methods for assessing the value of the fund's assets. (Under ERISA, some of these actuarial methods are no longer permissible). Under the "cost" method of determining what amount Lakey was obligated to pay, the company would pay into the fund the current year's "future service benefits" plus a percentage of the pending "past service deficiency". Alternatively, under the "market value" method of financing, Hansen estimated what amount Lakey needed to contribute for the fund to remain "on track". If Hansen determined that the fund had on hand more than was necessary to be "on track" at the end of the fund year, because, for example, the assets on

---

7. Paragraph 3 of page 4 of the Pension Agreement between Lakey and the union, dated March 2, 1959.

hand increased in value, then it was not necessary for Lakey to make a contribution that fiscal year, and the fund would yet remain "current".

For example, the amount of investment income it was expected the fund would earn in the future changed suddenly in 1961 due to an increase in federally-allowable interest on money in savings accounts. This meant that the money in the pension trust fund after forty years would have earned more interest than was initially anticipated. Because of this sudden change in the interest assumptions, "tracking" of the fund was altered, and Lakey was said by Hansen to be ahead of its fund obligations. For this reason, even though Lakey made no fund contributions in 1962, the fund was "current". (Under ERISA, this approach to asset valuation is now impermissible. Instead of immediately crediting the fund with the total benefit resulting from a change in assumptions, an employer must amortize the benefit over a number of years. In this way, only a small percent of the estimated increase in value of the assets is immediately recognized by the employer, with the majority being credited in the future.)

Every summer, Hansen supplied Lakey with a "cost requirement report". This report was an estimate of the amount Lakey. could expect to pay (technically due as of October 31) based on the "cost" method of funding the plan. Following the close of the corporate fiscal year on December 31, Hansen additionally provided Lakey with "actuarial valuations". These reports were more precise in that Lakey was then able to supply the actuary with detailed information about its employees following preparation of the annual W–2 forms. In the actuarial valuations, Hansen would recommend an amount that Lakey contribute, and would also advise what amount was necessary to keep the fund "current" or "on track". The amount Hansen would recommend that Lakey pay was based on the "cost" approach to funding the plan, an approach which generally was more favorable to the employees because there was less variance in the annual contribution schedule. The amount Hansen advised was

minimally due resulted from the "market value" approach. Lakey sometimes made contributions based on Hansen's recommendations ("cost" approach), and sometimes made contributions which were minimally due to keep the fund "current" ("market value" approach).

Plaintiffs argued at trial, and the court rejects as not established, that Lakey was behind in its pension obligations throughout the 1960s. Plaintiffs' argument necessarily rests on the assertion that the "cost" method of funding the Pension Plan was the only actuarial method of assessing Lakey's obligation which was permitted under the Pension Plan. However, the Agreement itself, Paragraph 3, provides in part:

"The Employer will cause the Board of Administration to be furnished annually with a statement, certified by the actuary, that the amount of the assets of the Pension Trust Fund is not less than the amount then required by this Article to be in such Fund on the basis of funding future service credits and the past service deficiency as computed by the actuary, and on the basis of the maximum funding period then in effect as provided in the Article. The Employer will cause a copy of its Agreement with the Trustee to be filed with the Board.

"All such actuarial requirements shall be determined by a qualified actuary selected by the Employer, and shall be in accordance with assumptions and procedures generally acceptable to the Internal Revenue Bureau of the United States, as a basis for determining deductions for contributions to Plans qualified under Sections 501, and 401 of the Internal Revenue Code."

Defendant's expert, an actuary with comprehensive experience in pre-ERISA employee-retirement plans, testified that prior to ERISA, employment of the "market value" approach was an acceptable and common actuarial method of determining what amount employers needed to pay to pension funds such as Lakey's to insure that after 40 years the past service deficiency and

future service costs were funded. Hence, the "market value" approach taken by Hansen was not in conflict with the dictates of the Pension Plan or Pension Agreement, nor did this approach violate state or federal law.

Under Paragraph 3 of the Agreement, Lakey annually was to furnish the Board of Administration "with a statement, certified by the actuary, that the amount of the assets of the Pension Trust Fund is not less than the amount then required by this Article to be in such Fund on the basis of funding future service credits and the past service deficiency as computed by the actuary, and on the basis of the maximum funding period then in effect as provided in the Article. The Employer will cause a copy of its agreement with the Trustee to be filed with the board." In fact, after 1958, Lakey invariably failed to supply the Board with an actuarial certificate (which testimony at trial established was a meaningless piece of paper, merely informing the Board that in the actuary's opinion, the company was meeting its annual obligations). Nor did the company supply the Board with any other actuarial information required by this paragraph, such as the actuarial assumptions being made, or the method of valuing assets that Hansen employed.

Hansen's actuarial valuations and cost requirement reports were sent directly to Lakey and were not shared with the Board, or more specifically, with the union. This is true except for the years 1968 and 1971. In 1968, for bargaining purposes, the union asked for and received Hansen's actuarial valuation for the plan year ending in 1966. (A note was attached reciting that, during the 1966–67 fiscal year, the accrued, but unpaid contribution of $216,900 has been satisfied. As already noted, it was Lakey's normal practice to defer contributions until the following fiscal year, although this was not known by defendant or the Local.) In September, 1971, the union was supplied with Hansen's cost requirement report for the plan year ending October 31, 1971.

*Lakey's Financial History.*

Lakey Foundry was in and out of financial difficulty throughout the 1960s. In fact, it lost money in six of the twelve years preceding bankruptcy, and the losses for those years greatly surpassed the gains posted in other years.

In 1962, Hansen's cost requirement report advised a pension contribution payment of $166,653. However, using a "market value" approach to evaluate the need for contribution, and due to an unanticipated increase in the value of the fund's assets, Hansen informed Lakey that no contribution was absolutely necessary that year. Lakey made none, nor did it contribute to the fund for plan years 1963 and 1964.

To raise capital, Lakey was required to borrow. Beginning at least in 1963, and until 1972 when the company went bankrupt, creditors held a security interest in Lakey's accounts receivable and inventory. In 1970, this security interest was extended to the remainder of the company's possessions except for its equipment and real estate, and by mid-1971, no assets at the plant remained unsecured.

For over 40 years, Lakey had been a self-insured employer for purposes of the state's Worker's Compensation Act. In 1964, the state's Compensation Department became concerned about the viability of the company, after monitoring revealed Lakey's doubtful financial condition.

In 1966, the state refused to continue Lakey's status as a self-insured participant in the Worker's Compensation program,[8] absent a guarantee by the company that it not encumber corporate real estate, and only upon establishment of a worker's compensation trust fund, with annual contributions of at least $180,000. Union intervention on the company's behalf, and its approval of the compromise, were necessary for Lakey to continue operations.

---

**8.** Testimony at trial established that had the state required Lakey to obtain private insur-ance, it would have gone bankrupt.

In 1968, the Michigan Air Pollution Commission investigated Lakey's facilities, and in 1969 insisted on substantial capital outlays for purchase of pollution control equipment. This required, by October 31, 1970, expenditures of $750,000. The union again interceded on the company's behalf, granting Lakey permission to borrow this money from the worker's compensation trust fund. Without the union's cooperation throughout this period, it is undisputed that Lakey would have closed down immediately.

Lakey made no pension contribution in 1969. Testimony at trial established that, for the first time, Lakey failed to keep the fund "current". However, in 1970, Lakey made a pension contribution of $726,492, part of which was applied to the plan fiscal year ending October 31, 1969. This contribution was $323,970 more than was required that year to keep the fund current. This was the last contribution Lakey made to the pension fund prior to, or after, its bankruptcy.

In 1970, the company experienced further financial difficulty. Lakey asked for, and received, the union's support altering, in the company's favor, the worker's compensation trust fund requirements established by the state.

In 1971, the 1968 Collective Bargaining Agreement between Lakey and the union expired. A new agreement could not be reached, and so the 1968 agreement was continued on a daily basis while negotiations continued. On July 8, 1971, a negotiation session was held in Muskegon, Michigan, and was attended by Lakey's president, Guy F. Campbell, and James R. Hale, Lakey's labor attorney since 1968. In attendance on behalf of the union were the Local's bargaining committee, the Local's president, Region 1–D's assistant regional director, and Victor Scott, since 1966 the international representative for Local 403, and a member of both the Local's Pension Committee and the Pension Fund's Board of Administration. During this negotiation session, Hale informed the union members that Lakey had not made a contribution to the fund for the fiscal year ending in 1970,

estimated to be approximately $550,000, and that an even larger contribution would be due but not paid for the plan year ending in 1971. Hale stated that Lakey lacked funds to make these contributions, and if required to pay, would immediately go bankrupt. Also at this meeting a request was made for the union's support in freeing up the worker's compensation trust fund for use as collateral in obtaining long-term financing. The union agreed to this, but Scott, on behalf of the union, threatened a strike if the company refused to honor its pension fund obligations. Hale repeated that the company lacked the capacity to make pension payments, and stated that a strike would "kill the company". This is the first time the union was expressly informed of an unremedied deficit in the pension trust fund.

There was evidence Scott thereafter was informed by company officers that any newly-acquired financing would be used to make up the deficit in the pension fund. However, in August, Hale informed Scott that this was not true and that the prior assurances to the contrary were unauthorized. An audit of the company was offered to verify the company's financial position. On October 21, 1971, this audit was completed, and the union then learned that Lakey's financial condition was terminal. It was estimated that the pension fund was short by over $1 million.

In November, 1971, Lakey informed the union that its health insurance premium was overdue, and that the company would have to close down unless the union consented to let the company borrow money from the worker's compensation trust fund. To keep the foundry workers employed as long as possible, this was allowed.

On February 7, 1972, Lakey voluntarily petitioned for bankruptcy under Chapter XI of the Bankruptcy Act, and ceased operations. Local 403 filed a claim for $6,500,000, of which it alleged $1,500,000 represented the unmet deficit for plan years ending in 1970 and 1971, and of which, according to the Union, $5,000,000 represented the remaining amount of past service deficiency that was unpaid. Unsecured claims against the company, including the

pension fund obligations, amounted to over $31,000,000, none of which was paid.

Rumors of a possible deficit in the pension trust fund began to surface sometime in 1971.[9] Victor Scott was approached by Leroy Hayes, a member of the Pension Committee from 1969 until the Local disbanded, and was asked to obtain information concerning the fund's solvency. (Hayes testified that he approached Victor Scott, possibly as early as 1969. However, this was denied by Scott. I am convinced that Hayes' interest in the possibility of a pension trust fund deficit was not expressed until late 1970 at the earliest.) Apparently, the information was not provided to Hayes until late 1971, by which time the shortages already had been confirmed. No other member of the Local, including members or former members of the Pension Committee, requested that Scott or anyone else seek an audit of the pension fund. However, it appears from the evidence that the membership generally assumed that Scott would "safeguard" its interest in the fund due to his superior comprehension of the fund's complexities, his ties with the Social Security Department of the UAW, and his participation on the Board of Administration of the Pension Plan. Prior to July 8, 1971, no member of the union, including Scott, knew for a fact that since November 1, 1970, the fund was being maintained at a deficit.

Lakey's marginal financial condition throughout the 1960s was common knowledge and certainly was known to the union. The need for a special worker's compensation trust fund in 1966, and the need to borrow from that fund in 1969 to finance air pollution equipment, should have alerted the union to the possibility that Lakey might be omitting its annual pension contributions. Yet, neither the Local, which relied on Scott to protect its interest, nor the International, which relied on the Local to protect its own interest, ever attempted to monitor the fund. Instead, defendant accepted on good faith the company's assurances that the payments were being met.

On August 7, 1973, plaintiff brought suit against defendant UAW, contending that by failing to monitor contributions to the pension fund defendant breached its duty of fair representation owed to the Local members. The class was certified by order of the Hon. Noel P. Fox, then Chief Judge of this court, in September of 1973.

In 1976, Hansen was added as a third-party defendant pursuant to a stipulation between plaintiffs and defendant, and plaintiffs moved to amend their complaint to add Hansen as a party-defendant. Thereafter, Hansen moved to vacate the order adding it as a third-party defendant, and filed briefs in opposition to plaintiffs' motion to add it as a defendant. Following transfer of this case to me in 1979, oral argument was held on these motions, and on January 30, 1980, Hansen's motion to vacate the order adding it as a third-party defendant, was granted. *See, Brown v. UAW*, 85 F.R.D. 328 (W.D.Mich.1980). It was determined that the court lacked jurisdiction over the third-party complaint because Hansen, by law, could not be held liable to defendant on a theory of indemnity or contribution. Moreover, plaintiffs' motion to add Hansen as a defendant was denied as untimely.

In July, 1980, defendant moved to dismiss and/or for summary judgment. The following month, plaintiffs moved to amend their complaint to add pendent state claims of breach of fiduciary duty, and breach of duties owed to plaintiffs as third-party beneficiaries of the Lakey-UAW Pension Agreement. On September 19, 1980, defendant's motion to dismiss was denied, and plaintiffs' motion to amend their complaint was granted. The trial on this case commenced on October 6, 1980, and ran eight days.

## DUTY OF FAIR REPRESENTATION

### I. Jurisdiction

*A. Statutory.*

Plaintiffs' primary claim arises under Section 9(a) of the National Labor Relations

---

**9.** Rumors of shortages also arose in 1969, but these rumors concerned possible shortages in the worker's compensation fund due to the company's purchase of pollution equipment.

Act, 29 U.S.C. § 159,[10] under which labor organizations, because of their statutory right to exclusively represent employees for purposes of collective bargaining, have a duty to fairly represent those employees. *See, Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1952); *Nedd v. United Mine Workers of America,* 556 F.2d 190 (3d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978). *Cf., Tunstall v. Brotnernood of Locomotive Firemen & Engineermen,* 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). Jurisdiction is correctly premised on 28 U.S.C. § 1337,[11] and 28 U.S.C. § 1331,[12] and venue is proper under 28 U.S.C. § 1391(b).[13] *See,* Boyce, *Fair Representation, the NLRB, and the Courts,* University of Pennsylvania Industrial Research Unit (1978).

**10.** 29 U.S.C. § 159(a) reads:

(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

**11.** 28 U.S.C. § 1337 reads in part:

**§ 1337. Commerce and antitrust regulations; amount in controversy, costs**

(a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies: *Provided, however,* That the district courts shall have original jurisdiction of an action brought under section 20(11) of part I of the Interstate Commerce Act (49 U.S.C. § 20(11)) or section 219 of part II of such Act (49 U.S.C. § 319), only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

**12.** 28 U.S.C. § 1331 reads:

*B. Standing.*

Defendant contends no duty of fair representation was owed to plaintiff class, so no claim for breach exists, because the definition of "employee" in the National Labor Relations Act, 29 U.S.C. § 151 et seq., (hereinafter "NLRA"), as set out in Section 2(3) of the Act, 29 U.S.C. § 152(3), does not include retirees and other terminated employees. *See, Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). However, that case is plainly distinguishable from the present context.

 In *Pittsburgh Plate Glass,* the Court held that an employer was free to bypass a union and directly contact retirees about proposed changes in benefits, even though those retirees were still members of

**§ 1331. Federal question; amount in controversy; costs**

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States, except that no such sum or value shall be required in any such action brought against the United States, any agency, thereof, or any officer or employee thereof in his official capacity.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

**13.** 28 U.S.C. § 1391 reads in part:

**§ 1391. Venue generally**

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

the union. The Court reached this holding because retirees are no longer "employees" under the NLRA, and so a labor organization has no obligation to represent them. In the present case, to the contrary, plaintiffs are former dues-paying members of the UAW, who allege breach of defendant's duty of fair representation while plaintiffs were yet actively employed. As plaintiffs correctly argue, defendant's duty does not become non-existent merely because retirement benefits are at issue. Quite the opposite. It is an unfair labor practice for employers to refuse to bargain about *active* employees' retirement benefits, *Pittsburgh Glass Co. v. NLRB*, 427 F.2d 936 (6th Cir. 1970), aff'd sub nom., *Allied Chemical & Alkali Workers of Am. v. Pittsburgh Plate Glass, supra*, and once retirement benefits are secured, a union is obliged to protect those rights. *See, Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Nedd v. UMWA, supra*.[14] Defendant's reliance on *Pittsburgh Plate Glass* would lead to the anamolous result that while labor organizations are forbidden from bargaining away vested pension rights, no member of a union has standing to complain. For these reasons, I am satisfied that plaintiffs have standing to maintain this action against defendant International Union.

## C. Vicarious Liability.

Defendant next contends that it cannot be held liable for negligent failure to act on the part of its officers (in this case Victor Scott) or of a local, absent proof of authorization, encouragement, or ratification, citing as support *Carbon Fuel Co. v. United Mine Workers of America*, 440 U.S. 957, 99 S.Ct. 1495, 59 L.Ed.2d 769 (1979); *Shimman v. Frank*, 625 F.2d 80 (6th Cir. 1980), and *North Am. Coal Corp. v. UMWA Local 263*, 497 F.2d 459 (6th Cir. 1974). Consequently, defendant contends, because Victor Scott's presence on the Board of Administration was at the Local's request,

and because the International Union had not sanctioned Scott's participation on the Board, or his failure to monitor the pension fund, the International cannot now be held vicariously liable for Scott's alleged nonfeasance.

Cases cited by defendant are not controlling. In *Carbon Fuel Co. v. UMWA, supra*, the Supreme Court held that under the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* (hereinafter "LMRA"), an international labor organization is not responsible for unauthorized wildcat strikes initiated by a local in violation of a collective bargaining agreement, nor is the International obligated to attempt to prevent strikes. In *Shimman v. Frank, supra*, dissident members of a union, who were physically attacked and beaten at a union meeting by Local officers, sought to hold both the Local and the International liable for breaching the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* This circuit held that the International cannot be held vicariously responsible for the Local's illegal acts, absent proof of complicity, even though the International was aware of anti-dissident abuses at the Local level, and even though one of the attackers, a business manager of the Local, was also one of the International's vice-presidents. Finally, in *North Am. Coal Corp. v. UMWA Local 222, supra*, the Sixth Circuit reversed criminal contempt convictions of a local union and its officers arising out of a work stoppage by union members in defiance of a federal court order enjoining strike. With particular relevance to the present case, the Court stated, at 466–467:

> It has been clear to Congress for many years that imposition upon unions of vicarious liability for the unauthorized acts of individuals could easily mean the elimination of labor unions as a social institution in America. The clearest expression of Congressional concern is, of course, in the Norris-LaGuardia Act and, specifically, in Section 6 thereof.

14. *See also*, Boyce, *Fair Representation, the NLRB and the Courts*, University of Pennsylvania Industrial Research Unit (1978); Summers, *The Individual Employee's Rights Under the Collective Bargaining Agreement: What Con*stitutes Fair Representation?*, 126 U.Pa.L.Rev. 291 (1977); Goetz, *Developing Federal Labor Law of Welfare and Pension Plans*, 55 Cornell L.Rev. 911 (1970).

Irresponsible or violent acts by individual workers (or by agents provocateur) if automatically attributable to the union on the scene could, of course, serve to destroy it. But such vicarious liability is repugnant to due process of law. And this circuit has repeatedly recognized that unions may only be held responsible for the authorized or ratified actions of its officers and agents. *See Blue Diamond Coal Co. v. United Mine Workers of America*, 436 F.2d 551 (6th Cir. 1970), cert. denied, 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1971); *Lewis v. Benedict Coal Corp.*, 259 F.2d 346 (6th Cir. 1958), aff'd by an equally divided Court, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); *Garmeada Coal Co. v. International Union, United Mine Workers of America*, 230 F.2d 945 (6th Cir. 1956).

In each of these cases this court recognized that where a union did not call, authorize, or encourage a strike, and, on the contrary, employed its authority to oppose it, no liability for an unauthorized or wildcat strike could be attributed to the union. (Footnotes omitted.)

Each of the cases cited above concerns an attempt to hold a union vicariously liable for acts of others which were either illegal or contrary to a collective bargaining agreement. However, such is not the case here, where Scott's assistance to the Local, by sitting on the Pension Agreement's Board of Administration, was not only legal but was a legitimate and expected function of his role as the international representative. Nor is this a case where plaintiffs seek to hold the International vicariously liable for acts committed by the Local or one of its officers. Scott was at all times an international representative, whose salary was paid by the International, and who maintained an office at Region Headquarters. Moreover, defendant does not suggest that Scott acted "wearing two hats", as in *Shimman* ; Scott was not a member of the Local, paid no dues to it, and no claim is made that by sitting on the Board of Administration, he breached a duty owed to the International. Scott at all times was employed by the International, and part of his duties included assisting the Local through his presence on the Board of Administration. At all times, he acted within the range of duties expected of him. He was on the Board because of his relationship to the International, particularly his access to the "expertise" which the International's experts in Detroit could provide. Scott's action or inaction on the Board was that of an international representative, and this action or inaction is attributable to defendant under the doctrine of respondeat superior.

### D. Statute of Limitations.

Defendant next contends that plaintiffs' claims are barred because plaintiffs' suit was not brought within three years of accrual of their claims, the limitations period under state law applicable to the present action. *See, Brown v. UAW, supra.* Defendant notes that the complaint here was filed on August 7, 1973. Under state law, a claim accrues at the point where plaintiff knew or should have known of the commission of the alleged tortious conduct. *See, Williams v. Polgar*, 391 Mich. 6, 215 N.W.2d 149, (1974). Therefore, for plaintiffs' claims to be timely, those claims must have "accrued" within three years of August 7, 1973, (i. e., after August 7, 1970). Defendant maintains, however, that in fact plaintiffs knew or should have known of defendant's alleged breach of duty prior to August 7, 1970, and so accrual of the claims occurred more than three years before suit was initiated.

No credible evidence was adduced at trial establishing that at any time prior to August 7, 1970, when the statute of limitations began to run, plaintiffs were ever aware of a deficit in the fund, or that defendant was not monitoring the fund as expected. Although rumors of a deficit surfaced in 1969, those rumors concerned a possible deficit in the worker's compensation trust fund, and not the pension fund. No knowledge of a deficit in the pension fund existed until mid-1971, when Mr. Hale informed the bargaining committee that the company had not made a contribution

to the fund for the plan year ending October 31, 1970. Indeed, Scott himself testified that he was surprised when Hale informed him of the deficit. Consequently, I am satisfied that plaintiffs' claims accrued within three years of bringing this action and, therefore, the suit is timely.

### E. Failure to Join Necessary Parties.

■ Defendant further contends that because this is an action for breach of fiduciary duty, under Rule 19 of the Federal Rules of Civil Procedure other fiduciaries, such as Hansen or the remaining Board of Administration members, should have been joined. Because these other fiduciaries were not joined, defendant now argues that trial on the merits·was improper.

In a prior opinion in this case, *Brown v. UAW, supra,* this court held that defendant's motion to add A. S. Hansen, Inc., as a cross-defendant was impermissible under Rules 19 or 14(a) because defendant sought to assert against Hansen a claim entirely separate and unrelated to plaintiffs' claim

(i. e., that defendant breached its duty of fair representation) even though the differing claims arose out of the same set of facts. No other party had a duty to fairly represent plaintiffs and the court fails to see how any other party could resultingly be considered "necessary".

Moreover, under Rule 19, parties need be joined only if (a) absence of joinder will impair a party's ability to protect its interests, and (b) if failure to join will subject defendant to the possibility of multiple liability.[15] In the present case, no such likelihood of multiple liability exists, for only defendant can be liable to plaintiffs for a breach of duty of fair representation. Since it is impossible, in the present context, for any other party to be held liable to plaintiffs under this theory, no other party could later seek indemnity or contribution against defendant.[16] For this reason, I find no merit in defendant's contention that trial on the merits proceeded in violation of Rule 19.[17]

---

**15.** Rule 19 reads in part as follows:

**Rule 19. Joinder of Persons Needed for Just Adjudication**

**(a) Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

**(b) Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent

person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**16.** Although other union members of the Board of Administration, perhaps, could be held liable for a breach of fair representation, defendant's argument realistically is directed to the presence of A. S. Hansen, Inc., and not to now-judgment proof members of the Local. In fact, plaintiffs are time-barred from suing the Local or its officers, and so no other party exists which conceivably could ever bring an action against defendant for contribution.

**17.** Defendant cites *Nedd v. UMWA,* 400· F.2d 103 (3d Cir. 1968), as support for the suggestion that trustees to a pension plan must be joined for proper adjudication. However, in that case plaintiffs were seeking present enforcement of a pension agreement against employers who were failing to contribute as obliged. In this respect, the Supreme Court

### F. Exhaustion of Remedies.

Defendant lastly contends that plaintiffs should be barred from proceeding with this action because of a failure to exhaust available contractual and intra-union remedies. Defendant argues that the Pension Agreement set out grievance procedures which no plaintiff utilized. Further, defendant maintains that in asserting this claim against the union, plaintiffs should have pursued intra-union remedies available to them under Article 33, Section 13 of the UAW Constitution.

### 1. Contractual Remedies.

■ Defendant's contention that plaintiffs should have filed a grievance with the Pension Board for failure to monitor the trust fund totally lacks merit. As already stated, there was no knowledge of a deficit until mid-1971, at which time Lakey was nearly bankrupt. Exhaustion of remedies in such a context would have been wholly futile, and pursuance of futile remedies is not required. *See, Geddes v. Chrysler Corp.*, 608 F.2d 261 (6th Cir. 1979); *Ruzicka v. General Motors Corp.*, 523 F.2d 306 (6th Cir. 1975).

■ Moreover, exhaustion is not required where an employer has repudiated its willingness to comply with contract provisions. *See, Beriault v. Local 40, Super Cargoes & Check. of I.L.&W.U.*, 501 F.2d 258 (9th Cir. 1974). Lakey's refusal to make obligatory contributions to the Pension Plan is a repudiation which excuses plaintiffs' failure to pursue contractual remedies.

has held that joinder of employers and unions in fair representation cases is permitted when the claims against the employers arise under Section 301 of the Taft-Hartley Act, 29 U.S.C. § 185. *See, Vaca v. Sipes, supra.*

However, in the present case, Lakey has already been adjudicated bankrupt and is now non-existent. Consequently, it is impossible at this point in time for defendant to be saddled with multiple liability based on Lakey's breach of the Pension Agreement. In fact, plaintiffs in this case raise no claim against Lakey, fully knowing that any such claim would now be barred by the adjudication of bankruptcy. For these reasons, I find *Nedd*'s requirement of joinder irrelevant in the present context. *Cf.,*

### 2. Intra-Union Remedies.

Defendant additionally contends that plaintiffs' claims are barred because they failed to pursue available intra-union remedies before bringing suit in federal court.

This "exhaustion doctrine" was first applied by the Sixth Circuit in *Bsharah v. Eltra Corp.*, 394 F.2d 502 (1968), wherein the court upheld summary judgment dismissal of plaintiff's claims against an employer and the UAW because plaintiff failed to first pursue a grievance. The decision follows from the earlier Supreme Court ruling in *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), that employees are precluded from maintaining breach of contract suits against employers before first utilizing contractually-agreed-upon grievance machinery.

The exhaustion requirement has been continuously restated and affirmed, even in cases brought only against labor organizations and arising out of an alleged breach of fair representation.[18] Generally, courts which have adopted this rule have stressed its salutary goal of encouraging private settlement of disputes, protecting union autonomy, and preserving scarce judicial resources.[19]

While federal courts have almost unanimously required a preliminary attempt to exhaust intra-union remedies, few courts have decided on whom the burden of pleading and persuasion exists. In *Sedlarik v.*

*Czosek v. O'Mara*, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).

18. *See*, e. g., *Geddes v. Chrysler Corp., supra; Willetts v. Ford Motor Corp.*, 583 F.2d 852 (6th Cir. 1978); *Trail v. Teamsters*, 542 F.2d 961 (6th Cir. 1976); *Ruzicka v. General Motors Corp.*, 523 F.2d 306 (6th Cir. 1975).

19. *See*, Boyce, *supra*, at n. 21; Note, "Exhaustion of Intra-Union Procedures", *supra*, at n. 1. These authors are especially critical of the rule, citing, among other things, its particular unfairness to union members, its potential for abuse, and the resulting irrational benefit to non-members of labor organizations who are not required to exhaust.

*General Motors Corp.*, 54 F.R.D. 230 (W.D. Mich.1971), Judge Engel stated, at 233:

"[I]t is incumbent upon the plaintiff as a condition to his seeking relief in this court to plead affirmatively that he has either exhausted his remedies as set forth upon the contract upon which he relies or to plead facts in avoidance of that obligation showing that such procedures would be futile."

*Accord, Brookins v. Chrysler Corp.*, 381 F.Supp. 563 (E.D.Mich.1974). To the contrary, however, are *Fruit & Vegetable Packers Local 760 v. Morley*, 378 F.2d 738 (9th Cir. 1967); *Yeager v. C. Schmidt & Sons, Inc.*, 343 F.Supp. 927 (E.D.Pa.1972), and *Forline v. Helpers Local 42*, 211 F.Supp. 315 (E.D.Pa.1962).

Particularly relevant to the present litigation is *Foust v. Int. Broth. of Elec. Workers*, 572 F.2d 710 (10th Cir. 1978), *mod. on other grounds*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). There, plaintiff was injured and took a medical leave from his employment. Thereafter, plaintiff failed to apply for an extension of his leave and so his employment was terminated. Plaintiff appealed to the union, which negligently failed to file a grievance on plaintiff's behalf. At trial on plaintiff's suit against the union for breach of fair representation, defendant argued that plaintiff's claim was barred for failure to exhaust intra-union remedies. The Court of Appeals affirmed a verdict for plaintiff, noting in passing that no evidence was adduced at trial establishing that the available remedies would have been adequate.

■ I am convinced that the just and reasonable principles announced in *Morley, Yeager* and *Forline*, and intimated though not expressed in *Foust*, control the present action: where a defendant union in a fair representation case seeks to rely on failure by plaintiff to exhaust intra-union remedies, the burden is on the defendant, not the plaintiff, to prove that such remedies existed and were adequate. Labor organizations

are better suited, due to their more intimate knowledge of the available remedy procedures, to establish that the intra-union remedies are effective and fair. Moreover, such a ruling would militate, in part, the seemingly onerous exhaustion burden placed on union members which does not exist for non-union members.[20]

In the present case, while plaintiffs have failed to exhaust intra-union remedies, defendant introduced no evidence indicating that such remedies could fairly entertain plaintiffs' grievance, or compensate them for their alleged loss. This is a complex case involving over 1,000 plaintiffs and concerning areas of the law to which little or no precedent exists as a guideline. Although Article 33, Section 13 of the UAW Constitution was introduced as an exhibit at trial, no attempt was made to show that the remedies contained in the UAW Constitution could adequately and fairly determine the extent of plaintiffs' rights against the union, or the likelihood that the union could provide recompense. Indeed, while many cases have arisen supporting the exhaustion doctrine, the court is aware of no case involving a class action of the magnitude and complexity of the present one. For this reason, I am unwilling to believe, without proof to the contrary, that defendant's remedy is adequate.

■ Exhaustion is a judicially-created jurisdictional doctrine which, I believe, may be discarded where justice requires. To expect a class of 1,000 to seek voluntary monetary compensation from this defendant before initiating suit is a remarkable proposition. I cannot believe it is equitable to bar plaintiffs' enforcement of their rights solely because they did not first pursue arguably futile intra-union remedies. Because no showing has been made that the remedies available to plaintiffs were adequate, I dismiss as meritless defendant's attempt to foreclose a ruling on the merits.

---

20. Non-union members are not prohibited from suing unions for breaches of the duty of fair representation. *See, Steele v. Louisville &* *Nashville R. R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

## II. Duty

Plaintiffs claim that defendant and its agent, Victor Scott, were duty-bound to monitor the pension fund and to supervise and insist on Lakey's compliance with the Pension Plan. Specifically, plaintiffs contend that by:

(a) not requiring the company to comply with the requirements of the Pension Agreement for reporting status of assets and contributions to the fund;

(b) not ascertaining that after October 31, 1964, a funding deficit allegedly was accruing in the Plan which was steadily increasing in size;

(c) not taking any action to insure that the company was maintaining its contributions as required by the Pension Agreement, even though the union was aware of Lakey's serious financial condition, as well as the fact that bankruptcy of the company would likely result in a loss of pension rights to plaintiffs;

(d) not establishing any procedure or mechanism for routine review of either pension reports required to be filed by the company, or actuarial valuations;

(e) not detecting the fact that allegedly there was a funding deficit in the Plan, or that the company was not making contributions to the Plan as required by the Pension Agreement, even though the union received copies of actuarial valuations and cost requirement reports;

(f) not pursuing legal remedies against officers and directors of Lakey, even though the union allegedly had knowledge that it may have been defrauded by company officials; and

(g) not seeking legal remedies against actuaries employed by the Pension Plan, even though the union allegedly was aware that these actuaries may have submitted false and misleading actuarial reports;

defendant failed to act in plaintiffs' interests as union members, and for this reason, breached the duty of fair representation

arising under the National Labor Relations Act, 29 U.S.C. § 159(a). *See, Ford Motor Co. v. Huffman, supra.*

Defendant, to the contrary, contends that plaintiffs fail to state a cause of action, even if in fact they have been injured, unless they can show that defendant's alleged acts or omissions were "arbitrary, discriminatory, or in bad faith". *See, IBEW v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); *Vaca v. Sipes, supra.* Defendant asserts failure to monitor a pension fund, or more specifically, failure to fulfill the responsibilities of the Board of Administration as set forth in the Pension Agreement, is not arbitrary [21] and cannot, therefore, exist as the basis of a claim of failing to fairly represent plaintiffs. For the reasons that follow, I find that plaintiffs' complaint states a claim against defendants under the NLRA, and that defendant's inattentiveness to its responsibilities as a member of the Board violated its duty of fair representation.

The duty of fair representation is a standard of conduct imposed on a labor organization that acts as the exclusive representative for members of a bargaining unit. Although it is a doctrine of judicial origin, the obligation to fairly represent employees arises out of the exclusive representation provisions of the NLRA. Simply stated, the duty requires a union to fairly represent the interests of all bargaining unit employees, both collectively and individually.[22]

The fair representation doctrine first arose in the Supreme Court case *Steele v. Louisville & Nashville R.R. Co., supra,* although that case involved the Railway Labor Act. In 1953, the duty was extended to the NLRA via *Ford Motor Co. v. Huffman, supra.* The Court there stated, that in representing its members, a labor organization is granted "[a] wide range of reasonableness ... subject always to complete good faith and honesty of purpose in the exercise

---

**21.** No claim is made that defendant's alleged breach was either discriminatory or in bad faith.

**22.** *See,* Kopp, *The Duty of Fair Representation Revisited,* 5 Emp.Rel.L.J. 3, 4 (1979).

of its discretion." 345 U.S. at 338, 73 S.Ct. at 686. *See, Griffin v. UAW*, 469 F.2d 181, 182 (4th Cir. 1972).

Considerable confusion has surrounded attempts to articulate the standards applicable to a union's duty of fair representation. *See, Beriault v. Local 40 Super Cargoes & Check. of I.L.&W.U., supra*, at 263.[23] For example, following *Steele* and the later Supreme Court decision in *Amal. Assn. of Street, Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), many courts held that bad faith was a requirement of a fair representation claim, and so proof of "hostile discrimination" by the union was necessary. *See, e. g., Hardcastle v. Western Greyhound Lines*, 303 F.2d 182 (9th Cir.), *cert. denied*, 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962). At this time, however, only the Third and Fifth Circuits have maintained this limited view of what conduct by a union amounts to a breach. *See, Medlin v. Boeing Vertol Co.*, 620 F.2d 957 (3d Cir. 1980); *Coe v. United Rubber Workers*, 571 F.2d 1349 (5th Cir. 1979).[24]

The 1967 Supreme Court decision in *Vaca v. Sipes, supra*, has remained the benchmark for determining what fair representation standards are imposed on unions. As the Fourth Circuit stated, in *Griffin v. UAW, supra*, at 182–183:

> The outline of the duty of fair representation cognizable under Section 301 was further clarified in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). That case declared that a union is accorded considerable discretion in the handling and settling of grievances. The individual employee has no absolute right to insist that his grievance be pressed through any particular stage of the contractual grievance procedure. A union may screen grievances and press only those that it concludes will justify the expense and time involved in terms of benefiting the membership at large. *En-*

*cina v. Tony Lama Boot Co.*, 448 F.2d 1264 (5 Cir. 1971). In the *Vaca* decision itself, the Court held that a union did not necessarily breach its duty of fair representation when it refused to take a member's grievance to arbitration.

Nonetheless, the Supreme Court did not invest the union with a carte blanche. It sought to fashion an appropriate standard by which to measure union conduct. "[The doctrine of fair representation] includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes, supra*, 386 U.S. at 177, 87 S.Ct. at 910. A union must conform its behavior to each of these three separate standards. First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

Confronted with what has been termed this "broadening" of the standards originally put down by the Court in *Steele*, (*see, Retana v. Apartment, Motel, Hotel & El. Op. U., Local 14*, 453 F.2d 1018, 1023, n. 8, (9th Cir. 1972)), the Sixth Circuit, in *Ruzicka v. General Motors Corp.*, 523 F.2d 306 (1975), has extended union liability to include, in certain circumstances, merely negligent failure to act. In that case, plaintiff was discharged for intoxication at work and for abusive and threatening statements made to his supervisors. Plaintiff filed a grievance, which proceeded without resolution through the first three steps of the grievance machinery. At the next griev-

---

**23.** *See also*, Morgan, *Fair is Foul, and Foul is Fair—Ruzicka and the Duty of Fair Representation in the Circuit Courts*, 11 Toledo L.Rev. 335 (1980); Symposium, *The Duty of Fair Rep-* resentation: *A Theoretical Structure*, 51 Texas L.Rev. 1119 (1973).

**24.** *See also*, Morgan, *supra*, at n. 31.

ance level, the local was required to file a statement of the case, which it failed to do, though it was granted two time extensions. Because of this failure to file, plaintiff's right to arbitration was revoked and his termination affirmed.

Plaintiff thereafter brought suit in federal court contending that the local, by inexplicably failing to file the statement, breached its duty of fair representation. The district court granted the union's motion for summary judgment, concluding that the Local's omission was merely "neglectful", and so was not unfair representation.

On appeal, the Sixth Circuit reversed this holding, stating at 523 F.2d 309:

> As discussed above, the District Court concluded that Local 166 had not unfairly represented Appellant because Agent Panter had merely "neglected" to file the required Statement of Unadjusted Grievance and had not acted in bad faith. Appellee Local urges that this conclusion be upheld, asserting that bad faith is an essential element of any claim of unfair representation.
>
> We do not find the duty of fair representation so limited. In *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903 [916], 17 L.Ed.2d 842 (1967), the Supreme Court held that union actions which are "arbitrary, discriminatory, *or* in bad faith" (emphasis added) could establish a breach of the duty of fair representation. As we held in *St. Clair v. Local 515*, 422 F.2d 128, 130 (6th Cir. 1969),
>
> > The phrase "fair representation" is something of a term of art, and the standards by which we are bound have not been set down explicitly in a code. However, the Supreme Court has spoken clearly enough to guide us here. See *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Court there

held that the duty of fair representation does not require a union to exhaust every theoretically available procedure simply on the demand of a union member. 386 U.S. at 192 (87 S.Ct. 903 [at 917]). . . . However, the ignoring or the perfunctory processing of a grievance may violate the duty of fair representation. *Vaca v. Sipes*, 386 U.S. at 194, 87 S.Ct. at 903. Agreeing with the Fourth Circuit's three-pronged approach taken in *Griffin, supra*, the Court in *Ruzicka* concluded at 310:

> Having sought and been granted two extensions of time to file the Statement and at no time having decided that Appellant's claim was without merit, the Local allowed the final deadline to pass without filing the Statement or requesting a further extension. At this point the Local did not inform either Appellant or GM that it had decided either to continue or to stop processing Appellant's grievance. Such negligent handling of the grievance, unrelated as it was to the merits of Appellant's case, amounts to unfair representation. It is a clear example of arbitrary and perfunctory handling of a grievance.

The court's opinion denying rehearing in *Ruzicka* engendered some doubt concerning whether negligence alone amounted to a breach of fair representation.[25] This doubt was dispelled, however, by the subsequent ruling in *Milstead v. Intern. Broth. of Teamsters, Local 957*, 580 F.2d 232 (6th Cir. 1978).[26] In that case, a dispute arose between plaintiff and his employer concerning whether plaintiff worked long enough to be entitled to the benefits of seniority status under a union-management agreement, which would have afforded plaintiff job security. In representing his grievance following his layoff, a union agent overlooked key language in the agreement which would have supported plaintiff's case.

---

**25.** In its denial of a rehearing on December 9, 1975, the court stated at 528 F.2d 913: "Our opinion in this action speaks to a narrow range of cases in which unexplained union inaction, amounting to arbitrary treatment, has barred an employee from access to an established un-

ion-management apparatus for resolving grievances."

**26.** *See also, Williams v. Teamsters Local Union No. 984*, 625 F.2d 138 (6th Cir. 1980); *Malone v. U.S. Postal Service*, 526 F.2d 1099 (6th Cir. 1975).

Plaintiff thereafter brought suit against the union claiming that this failure to notice and plead the crucial contract language amounted to breach of the duty of fair representation. A jury verdict on behalf of plaintiff was upheld by the Sixth Circuit, with the court stating at 235: "Certainly the duty of fair representation may be breached whenever a union ineptly handles a grievance because it is ignorant of those contract provisions having a direct bearing on the case." [27]

While *Ruzicka* holds that in order to avoid liability unions must refrain from negligent or perfunctory handling of grievances, it is clear that this extension of the duty of fair representation has limits. The *Ruzicka* court itself sought to contain the holding when, in its denial of a motion for rehearing, it stated at 528 F.2d 913:

The Unions contend that the Court's opinion contains language which conflicts with language in *Balowski v. UAW*, 372 F.2d 829 (6th Cir. 1967), and *Dill v. Greyhound Corp.*, 435 F.2d 231 (6th Cir. 1970), and consequently with cases which rely on *Balowski* and *Dill*. In *Balowski* the Union took a variety of steps on the employee's behalf and all of these steps were taken in a timely manner. It was not until an independent physician found the employee unable to perform the duties of the job to which he was seeking reinstatement that the Union withdrew the employee's grievance. In *Dill*, although the union local failed to take action on Dill's grievance it did resolve the grievance of two other similarly situated employees which raised the identical question contained in *Dill's* grievance. We distinguished *Dill* by stating:

"We do not deviate from our holding in *Dill* to conclude that when a union makes no decision as to the merit of an individual's grievance but merely allows it to expire by negligently failing to take a basic and required step to-

wards resolving it, the union has acted arbitrarily and is liable for a breach of its duty of fair representation." 435 F.2d 231.

Thus, we distinguish the *Balowski-Dill* line of cases in which the unions considered the issues raised in the employees' grievances and decided the grievances did not merit pursuing.

Our opinion is this action speaks to a narrow range of cases in which unexplained union inaction, amounting to arbitrary treatment, has barred an employee from access to an established union-management apparatus for resolving grievances.

This same concern about deference to union judgment was reiterated in *Milstead*, where the Court stated, at 580 F.2d 236:

After receiving a copy of the Air Freight Agreement from a Company representative, Brown reviewed its contents but failed to notice that the oftquoted seniority provision was missing. If Brown was not aware of the informal agreement, he may have been remiss in not noticing the absence of the seniority provision from the Air Freight Agreement. If, on the other hand, he was aware of the informal agreement, he may have breached his duty by failing to inform Milstead or the Joint Committee of it.

However, this does not necessarily imply that the Union was required to argue the absence of the seniority provision in Milstead's behalf. The Union could have refrained from arguing the point in deference to larger Union interests. As stated by the Court of Appeals for the Fifth Circuit,

The major goal of the duty of fair representation is to identify and protect individual expectations as far as possible without undermining collective interests. Where the individual and

---

27. Other courts and commentators agree that *Ruzicka* stands for the proposition that negligence or perfunctory filing of a grievance amounts to a breach of the duty of fair representation. *See, e. g., Ethier v. U. S. Postal Service*, 590 F.2d 733 (8th Cir. 1979); *Foust v. Int. Broth. of Elect. Workers, supra. See also*, Morgan, *supra*, at n. 31; Kopp, *supra*, at n. 30; Summers, *supra*, at n. 21.

collective group interests clash, the former must yield to the latter. Where collective bargaining agreements are executed, there may be many provisions which lead individual employees to believe they are entitled to specified benefits but, in the final analysis, the collective group interests must remain paramount. *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 956–957 (5th Cir. 1976).

In this case, no analysis of competing collective and individual interests could have occurred because the Union was seemingly unaware of Milstead's interest in the missing seniority provision. (Footnote omitted.)

Commentators have read *Ruzicka* as giving rise to a two-tiered test. A distinction is said to exist between negotiation of a contract and its administration.[28] Under this view, a union refusal to pursue a grievance through arbitration, such as was the case in *Vaca v. Sipes, supra*, because of a determination that plaintiff's grievance is meritless, will not be disturbed absent proof of hostility or discriminatory animus toward plaintiff, or of gross arbitrariness. However, where the union fails to pursue plaintiff's grievance solely because of a negligent failure to timely file the appropriate papers, such negligent failure will be held "arbitrary" or "perfunctory" conduct constituting a breach of duty.[29]

Applying this approach to the present case, the questions at hand are twofold: (1) did defendant owe to plaintiffs a duty to monitor the pension fund, or to otherwise satisfy the responsibilities of being a member of the Board of Administration, and (2) is negligent breach of these duties a violation of defendant's obligation to fairly represent its members?

## A. Did Defendant Owe Plaintiffs a Duty to Monitor the Fund?

Defendant initially contends that, as a matter of law, no duty to monitor the pension fund was ever owed to plaintiffs, even assuming Victor Scott acted, or failed to act, on behalf of the International Union. Defendant cites as supportive *Bryant v. UMWA*, 467 F.2d 1 (6th Cir. 1972). However, I am convinced that this case is inapplicable.

In *Bryant*, a collective bargaining agreement between a coal mine operator and a union resulted in establishment of a safety program, including a "Mine Safety Committee". The Mine Safety Committee was accorded the right to inspect the mines and to make recommendations to management when life-threatening conditions were discovered.

Following a mine explosion which killed nine miners, families of the decedents brought suit against the union alleging a breach of duty by failing to inspect. A unanimous Sixth Circuit panel dismissed plaintiffs' claims. The court interpreted the grant of authority to the Mine Safety Committee to inspect as not arising until a federal mining inspector first reported violations of the Federal Mine Safety Act. Because no federal inspector had yet cited the mine operator for violations, the court held, the Mine Safety Committee had no authority to inspect the mine, and so no breach of the union-management agreement had occurred.

In dicta, the court added that the union could not be held liable for breach of duty of fair representation because the union-management agreement made the inspec-

---

**28.** *See*, Summers, *supra*, at n. 21; Boyce, *supra*, at n. 21.

**29.** Support for this view can also be found in Supreme Court statements concerning the need for unions to have great autonomy in decision-making. For example, in *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), the Court implied that to prove breach, plaintiff must demonstrate something more than mere error in *judgment*. A two-tiered approach affords labor organizations the freedom necessary to negotiate contracts, and to interpret those contracts through later administration, without fear of reprisal by disgruntled employees. Yet, unions are not free to wholly ignore employees' rights, or to avoid the obligations of administrating employment contracts, having once negotiated on employees' behalf.

tions by the Mine Safety Committee permissive, but not mandatory. The court, per Judge Celebrezze, stated at 467 F.2d 4–6:

> Further, we are far from convinced that the contract necessarily makes the Union financially responsible for a failure to compel correction of Code violations even in situations where such violations *have been reported* by federal mine inspectors. Sub-sections (a) and (b) read together give the Union the power to compel compliance; nothing in the language of those subsections seems to require the Union to exercise such power. Collective bargaining agreements are literally agreements between unions and employers; the Union negotiators are intent on gaining the maximum power possible from management negotiators. Whether or not they choose to exercise all the power gained depends on a variety of situations relating to the overall employment situation in the industry. It would be a mistake of vast proportion to read every power granted the union by management as creating a corollary contract right in the employee as against the union. Such interpretation of collective bargaining agreements would simply deter unions from engaging in the unfettered give and take negotiation which lies at the heart of the collective bargaining agreement.

> \*　\*　\*　\*　\*　\*

> This Court is not unfamiliar with the difficult and longstanding problem of ensuring safety in the coal mines of this country. We recognize the harsh plight of those who have lost the family breadwinner through the all too frequent intervention of mining disaster. The answer to their problem is not to pervert the collective bargaining process by reading into its instruments a liability which was never contemplated and duties which were never assumed in fact or in theory. To saddle labor unions with liability for the mine operators' failure to comply with standards introduced into the contract at the union's bidding would simply be to discourage the inclusion of similar or more effective standards in later contracts. Such result would not serve the interest of miners and would retard rather than advance the goals of the National Labor policy. (Footnote omitted.)

■ *Bryant* does not control the present case. Here, the responsibilities of the Board of Administration were not permissive, but were mandatory. While no obligation to inspect existed for the Mine Safety Committee in *Bryant*, here, the Board of Administration was *obligated* to supervise the Pension Fund and to insure that Lakey was making pension contributions. Paragraphs 6(2) and (3) read that the Board *shall* receive reports, analyze data and promulgate rules. It is but a small step to say that the Board was additionally obligated to make Lakey provide those reports, data and information, especially since failure by the company to do so was a breach of the Agreement. Cf., *Nedd v. UMWA*, 556 F.2d 190, 197. Consequently, I find *Bryant* distinguishable,[30] and am convinced that defendant, in this case a member of the Board of Administration acting through Victor Scott, owed a duty to plaintiffs to responsibly fulfill its obligations as a member of the Board, to monitor Lakey's payments to the fund, and to bring to the attention of the membership any material delinquencies in contributions to the fund on Lakey's part.

### B. *Is Negligent Breach of Defendant's Duty to Monitor a Violation of the Duty of Fair Representation?*

■ The existence of a distinction between negotiation of an employment contract, wherein great deference is accorded union judgment, and a contract's administration, wherein a union's flexibility is more circumscribed, convinces me that negligent or perfunctory inattentiveness to its duties as an administrator of a pension plan may

---

**30.** Moreover, it is arguable that the holding in *Bryant* would be different following *Ruzicka*.

amount to breach of a union's duty of fair representation.[31]

▮ Once having obtained for its members pension benefits which vest and thereby become irrevocable, a labor organization has a subsequent duty to protect its members' interests in those benefits. *See, Vaca v. Sipes, supra.* Admittedly, this obligation to protect members' interests is limited; for example, the union is not, *without more*, obliged to monitor an employer's contributions to a pension fund. However, where a union accepts membership on a pension fund's supervisory board, the duty to effectively administer a contract dictates that the union assume and satisfy the resultant responsibilities. In such a case, negligent failure to responsibly act as a member of a pension fund's supervisory board may amount to a breach of the duty of fair representation, for the union has then arbitrarily failed to effectively administer the contract and protect its members' interests.

In this case, I find that under the Lakey Foundry Pension Agreement, defendant was duty-bound to monitor Lakey's compliance with the Agreement by procuring reports on the status of assets and contributions to the fund, as well as actuarial assumptions employed to determine what contributions were due. Moreover, corollary to this obligation was a requirement that defendant (a) ascertain that after October 31, 1964, a funding deficit allegedly was accruing in the plan; (b) establish some procedure or mechanism for routine review of either pension reports required to be filed by the company, or actuarial valuations; and (c) detect that a funding deficit existed in the plan, and seek to compel elimination of this deficit. I am satisfied that proof of failure to satisfy these basic responsibilities as a member of the Board of Administration establishes a breach of duty by defend-

ant. (These are responsibilities familiar to defendant and its actuaries. In fact, it was defendant's particular expertise in this area that motivated the local to invite Victor Scott to sit on the Board of Administration. If the International, through its representative, was unwilling to assume these basic, common sense responsibilities, it should have prohibited Victor Scott from joining the local's pension committee, and should not have been a signatory to the Agreement. To put it another way, once Scott, on behalf of defendant, voluntarily assumed the responsibilities inherent in membership on the Board of Administration, he was obliged to faithfully perform those duties.) Plaintiffs' allegations suggest negligent or perfunctory behavior of a type which, under *Ruzicka*, amounts to abandonment of the interests of Local 403's members.

▮ However, as already stated, not every failure to act by a labor organization amounts to a breach of duty, including failure to act in the administration of a contract. *Vaca v. Sipes, supra.* A union's refusal to act because of contemplative choice does not amount to a breach of duty absent proof of arbitrariness, discrimination, or bad faith. Where a union has consciously chosen not to act, proof of negligence is not enough to establish a breach of duty. Consequently, I am convinced that in the present case, plaintiffs must prove more than mere negligence on defendant's part in its refusal to seek legal redress against Lakey's officers or actuaries. Such a decision exists only as a matter of conscious choice involving the weighing of alternatives, and great deference must be accorded the union's discretion in this respect.

### III. Breach

▮ Having concluded that defendant, as a member of the Board of Administra-

---

**31.** For other cases suggesting that failure by a union to monitor a pension fund may amount to a breach of the duty of fair representation, see, *Nedd v. UMWA*, 400 F.2d 103 (3d Cir. 1968); *Retana v. Apartment, Motel, Hotel & El. Op. U. Local No. 14*, 453 F.2d 1018, 1024, n. 10 (9th Cir. 1972). Also see, *Robesky v. Qantas Empire Airways Ltd.*, 573 F.2d 1082 (9th Cir. 1978) (failure to inform plaintiff of all relevant factors in considering whether to accept an employer's offer of settlement is breach); *de-Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO*, 425 F.2d 281 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970) (failure to inspect grievance is breach).

tion, was contractually and statutorily bound to monitor Lakey's compliance with the Agreement, and that a negligent failure by defendant to fulfill these obligations may amount to a breach of fair representation, I am satisfied that in the present case defendant breached its duty of fair representation. The Board of Administration, for all practical purposes, never met (except to consider a particular grievance). No reports concerning payments to the fund or actuarial assumptions employed were ever received or analyzed. No reports on the expenditures for administration of the plan were ever promulgated. Yet, defendant never sought a meeting of the Board, nor did it ever request this information on its own. In effect, the existence and purpose of the Board, to monitor Lakey's compliance with the plan, was totally ignored by defendant.

Further, no attempt was made to communicate this lack of diligence to plaintiffs. Although defendant expected plaintiffs to protect their own interests, defendant knew or should have known that plaintiffs thoroughly depended on defendant to monitor the fund. Testimony at trial established that Scott's role as an international representative, and his relationship with the Social Security Department in Detroit, were key factors in deciding that Scott was best suited to ensure Lakey's compliance. Yet, Scott made no attempt to acquire actuarial information, which the Board had a contractual right to receive, even though fully aware that Lakey's financial condition was tenuous. Such perfunctory and negligent behavior, which the court finds inexcusable, amounts to a breach of defendant's duty to fairly represent the interests of Lakey's employees.

However, once the company advised of the deficit, defendant's decision not to pursue legal remedies against Lakey officers or Hansen cannot be held to be a violation of duty. This decision was a matter of discretion with the union, and its judgment cannot be disturbed unless it was arbitrary, discriminatory or in bad faith. No evidence was adduced at trial to prove

that the union did not fairly represent Lakey employees when it chose not to pursue legal redress against these persons after it became aware of a deficit in the fund. Accordingly, I find no breach of duty on that issue.

IV. Damages

Although I am satisfied that defendant breached its duty of fair representation by not monitoring the Lakey pension fund, I am convinced plaintiffs were not damaged by defendant's conduct. First with respect to which party has the burden of proof on the issue, plaintiffs contend the burden of proof concerning damages rests on defendant, once plaintiffs have established a breach of duty. *Nedd v. UMWA*, 556 F.2d at 210. Consequently, plaintiffs maintain that the burden is on defendant to prove, by a preponderance of the evidence, that plaintiffs were not injured by defendant's breach. The passage from *Nedd*, relied on by plaintiff, concerns proof of breach of fiduciary duty when a union acts as a trustee of a pension trust fund, and not breach of the duty of fair representation. I am not convinced, therefore, that plaintiffs are correct in asserting that defendant has the burden of establishing no injury to plaintiffs. Nevertheless, even assuming that the burden of proof shifts to defendant, I am satisfied that plaintiffs have not been injured by defendant's breach of duty, as more fully set out below.

As already stated, except for the years 1964 and 1969, when Lakey failed to timely pay into the fund as obligated (both defects were eliminated soon thereafter), no deficit existed in the fund until the close of the pension plan year ending in 1970. This follows from the testimony of defendant's expert that Hansen's utilization of a "market value" approach to funding the plan was a common and accepted actuarial practice prior to enactment of ERISA. Until October 31, 1970, Lakey continually paid the amount Hansen said was minimally necessary to keep the fund "current", although in many years Lakey failed or refused to pay the amount Hansen quoted in its cost

requirement report, or the amount Hansen recommended in its actuarial valuation that Lakey pay based on the "cost" approach to funding the pension trust. Moreover, despite a sharp dispute between the experts on this issue, I am satisfied the more convincing evidence establishes the plan was "on track" even though in several years Lakey made no contribution at all.

By late 1970, Lakey's financial condition was moribund. No unsecured assets remained, and Lakey had increasing difficulty in obtaining credit. In spite of this, plaintiffs' witnesses (particularly Lakey's former vice-president and accountant) testified that had the union demanded contribution to the fund even after October 31, 1970, the company would have complied.

However, defendant's second expert, an attorney specializing in credit and bankruptcy law, testified that had plaintiffs initiated a suit to compel Lakey's contribution, or even had Lakey made the substantial pension contribution due for the plan fiscal year ending October 31, 1970, Lakey's other creditors would immediately have petitioned for bankruptcy. In such a case, the trustee in bankruptcy would have recovered this trust fund payment and, as was the final result in 1975 when Lakey was adjudicated bankrupt, the employees would have received nothing due to their status as unsecured creditors.

Moreover, in July, 1971, Hale insisted, under threat of a strike, that Lakey had not and could not make its 1970 and 1971 pension contributions. Because Lakey traditionally contributed to the trust fund after the close of each calendar year, this failure by Lakey to pay its 1970 pension contribution preceded these mid-1971 statements of Hale by only a few months. This indicates, then, that even had the union demanded payment, Lakey could not have complied. Hence, although Lakey permitted a deficit to accrue in the fund for plan fiscal years ending in 1970 and thereafter, plaintiffs were without any means of enforcing the company to meet its obligations, even if they had known prior to July, 1971, that Lakey was in default. I find, therefore, that defendant's failure to monitor Lakey's compliance with the plan, its failure to determine what actuarial assumptions Hansen employed, and its failure to demand that Lakey eliminate the deficit accumulating in 1970, were acts which, though a breach of defendant's duty of fair representation, did not result in damage to plaintiffs.

Plaintiffs further argue, however, that even if Lakey's payment schedule prior to 1970 was not in breach of the plan, (i. e., Lakey's utilization of a "market value" method of financing the fund) had plaintiffs known of the size and frequency of the contributions, or the actuarial assumptions employed by Hansen, they could have gone on strike to require larger payments, or could have renegotiated the Agreement. Intuitively, there is some merit to this contention, for Lakey throughout the 1960's existed at the goodwill of the union. Union support and advocacy were necessary on several occasions to keep the company afloat. However, I am convinced that allegations of damage based on these assumptions are just too tenuous to warrant relief. Given Lakey's marginal existence throughout the 1960s, including the company's continuing need for union support in renegotiating with creditors, I cannot believe that even had the union known the actuarial assumptions employed by Hansen, it could have forced the company to contribute more. The union was fully aware that employees' jobs were at stake in keeping Lakey solvent, and evidence of this concern is the union's consent, in 1971, to lend Lakey money from the worker's compensation trust fund in order for Lakey to pay an overdue health insurance premium. It requires a great leap of faith to decide now, in 1981, that the union could have persuaded the company in 1964 to amend its payment schedule.

### BREACH OF FIDUCIARY DUTY

### BREACH OF CONTRACTUAL DUTIES OWED TO PLAINTIFFS AS THIRD-PARTY BENEFICIARIES

In their fourth amended complaint, plaintiffs also raise pendent state claims against

defendant, viz., that defendant breached fiduciary duties and other contractual duties owed to plaintiffs as third-party beneficiaries of the pension contract. These contentions require a determination of whether defendant, as a member of the Board of Administration, acted as a "trustee" of the fund, with whatever resulting obligations existed under state law.[32]

However, the court need not reach the merits of Counts II or III of plaintiffs' complaint. Under Michigan law, plaintiffs state no claim against defendant absent proof of injury. *Cf., Preston v. Wilcox*, 38 Mich. 578 (1878). *See also*, 22 M.L.P. *Trusts*, § 84 (1958). Such a view is in accord with general trust principles that, upon breach of a trust, trustees are chargeable for any loss to the trust resulting from the breach, or resulting profit which inured to the trustee. *See*, Restatement (2nd) of Trusts, § 205 (1959); 90 C.J.S. *Trusts* § 253 (1955).[33]

## CONCLUSION

Plaintiffs proved that defendant breached its duty of fair representation in failing to abide by the responsibilities of the Board of Administration of the Lakey Foundry Pension Plan. Plaintiffs have also proved that a deficit in the pension trust fund began to accumulate beginning with the end of the plan fiscal year ending on October 31, 1970. However, evidence at trial failed to establish that this deficit was the result of defendant's breach of its duty of fair representation. Moreover, because plaintiffs have been unable to link defendant's failure to act with the deficit in the Lakey Foundry Pension Plan Trust Fund, plaintiffs' pendent state claims are equally meritless. For these reasons, I enter judgment for defendant.

---

**32.** In this respect, *Nedd v. UMWA, supra*, is distinguishable in that the court there found the defendant union to be a trustee of a pension plan, a finding not necessary to the holding in this case.

**33.** The court need not determine whether the exculpatory clause in the Pension Agreement also would bar relief in this case.