Curtis MILSTEAD, Plaintiff-Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 957, Defendant-Appellant.

No. 76–2614.

United States Court of Appeals, Sixth Circuit.

Argued April 17, 1978.

Decided Aug. 2, 1978.

Rehearing and Rehearing En Banc Denied Sept. 5, 1978.

Rehearing Denied Sept. 5, 1978.

Sorrell Logothetis, Parks & Logothetis, Dayton, Ohio, for defendant-appellant.

David L. Hall, Pickrel, Schaeffer & Ebeling, Dayton, Ohio, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and JOHNSTONE, District Judge.*

JOHNSTONE, District Judge.

Plaintiff, Curtis Milstead, sued his former employer and union local under Section 301 of the Labor Management Relations Act,[1] claiming that the defendant IRC&D Motor Freight, Inc., [Company] had wrongfully discharged him and that defendant, Teamsters Local No. 957 [Union] had breached its duty of fair representation in failing to vigorously pursue his grievance. After the Court denied the Union's motion for a directed verdict, the jury found that the Union had breached its duty to Milstead, and assessed damages of $20,000 against it. The jury also found the Company liable and assessed damages of $10,000. Only the Union has appealed. We affirm as to the issue of Union liability but remand to the district court for a proper determination of damages.

Milstead began work for the Company in 1972 on an intermittent basis. His last period of employment for the Company began on March 18, 1974. The complaint alleges that this last period was sufficiently long to entitle Milstead to the benefits of seniority status accruing under § 41(a) of the Central States Area Local Cartage Supplemental Agreement [Local Cartage Agreement].[2] This agreement covered those Company drivers who worked on routes within a twenty-five mile radius of Dayton, Ohio.

The Local Cartage Agreement was supplemented by the Air Freight Rider Agreement [Air Freight Agreement] which applied specifically to those employees making deliveries to and from the Dayton airport. During the 1967–1973 period, the Air Freight Agreement contained a provision which required the Company to maintain separate seniority lists as to each "contract group" of employees. In effect, this provision meant that time spent under one contract could not be transferred and added to the days worked under another.

When the Air Freight Agreement was renegotiated in 1973 to cover the years 1973 through 1976, the provision containing the requirement of separate seniority listing was omitted. This gave the impression (at least on the face of the contract) that time spent under different contracts could be accumulated for gaining "regular employee" status. Some testimony at the trial, however, indicated that the provision was omitted inadvertently and that the Union and the Company had agreed informally to continue the seniority provision. Milstead worked 44 or 45 days during the March 18, 1974, through May 31, 1974, period. At trial, the essence of the dispute between the Company and Milstead was whether any of those days could be properly deducted so as to deprive Milstead of the job security af-

---

* The Honorable Edward H. Johnstone, United States District Judge for the Western District of Kentucky, sitting by designation.

1. 29 U.S.C. § 185.

2. That section reads in pertinent part:
   (a) *A new probationary employee shall work under the provisions of this Agreement but shall be employed only on a thirty (30) day trial basis, during which period he may be discharged without further recourse*; provided, however, that the employer may not discharge or discipline for the purpose of evading this Agreement or discriminating against Union members.
   (1) *Any new employee must work thirty (30) cumulative work days within any ninety (90)*

*calendar day period and upon completion thereof, shall be considered a regular employee and placed on the seniority list.* Such employee's seniority date for all purposes shall be established as of the first day worked in such ninety (90) calendar day period in which he meets the requirement aforementioned.
   (2) *Any day worked, regardless of whether or not [sic] he was used as a replacement shall be counted in determining whether or not [sic] he has qualified under the above provisions. A man can gain seniority by qualifying under the above provisions only.* (Emphasis added)

forded by seniority listing. Although not directly in issue here, it is necessary to explore the history of Milstead's employment with the Company to more fully understand the Union's duty of fair representation.

From March 18 through May 7, Milstead worked either 29 or 30 days. He testified that approximately five of those days were spent on the Air Freight route and the remainder on Local Cartage. The Company insisted that these five days could not be included for seniority listing purposes under the Local Cartage Agreement since separate seniority lists were maintained for each route. Milstead claimed that these Air Freight days could not be deducted since the Air Freight Agreement did not contain the provision requiring separate seniority listing.

On May 10, 1974, Milstead contacted the Company and asked whether any more work was available. He was told that he could not work without signing a 1974 Summer Replacement Waiver form.[3] If the form were not signed, any additional work by Milstead would have resulted in his attaining employee status. Believing that he had already accumulated sufficient time for such status, Milstead signed the form.[4]

Milstead worked 15 days throughout the remainder of May. On May 30, he was informed by the Company that it had no further need of his services. Milstead replied that he had already achieved regular employee status during the March 18—May 7 period. But the Company again asserted that he did not have the requisite 30 days under the Local Cartage Agreement since the time worked on Air Freight routes could not be included.

Having viewed the factual background of the events leading to the Company's dismissal of Milstead, we now turn to examine the process by which his grievance was denied. The Union received the grievance on June 6, 1974. After an attempt to informally reconcile the issue with the Company, the matter was placed on the agenda for the Joint Committee meeting scheduled for June 12.[5] At the meeting, Union business agent Sherman Brown presented an argument in Milstead's behalf. Milstead then spoke at length, reading from the text of his grievance.[6]

At the conclusion of Milstead's presentation, his claim to regular employee status was challenged on the basis of the separate seniority listing arrangement which presumably covered those employees working on the Local Cartage and Air Freight routes. This challenge was not answered. Brown testified at the trial that he was unaware at that time that Milstead had worked on both routes, and that his igno-

3. The form reads in pertinent part: "Employees hired between May 1st and October 1st as replacements for vacation or absenteeism will not accumulate or obtain seniority." This provision apparently waives the employee rights accorded under § 41(a)(2) of the Local Cartage Agreement, cited *supra* at n. 1.

4. Two days after Milstead signed the Waiver form, its use came under attack at a Union membership meeting. A majority of those present voted to terminate the use of the waiver. The Union leadership responded to the vote by placing the matter on the agenda for the next meeting of the Dayton Joint Local Grievance Committee [Joint Committee]. On June 12, 1974, the Joint Committee rescinded the use of the Waiver.

Milstead claims that the termination of the agreement was retroactive and that the days worked by him after May 10 should have entitled him to regular employee status. The failure of the Union to argue this point before the Joint Committee was an alleged breach of its duty of fair representation. Because we decide this appeal on other grounds, the merits of that contention will not be reached.

5. The processing of grievances through the Joint Committee is sanctioned by the National Master Freight Agreement. Its membership is comprised of Union and employer representatives.

6. This particular grievance was not presented to the Joint Committee prior to the hearing. Milstead had been told by his Union representative that the grievance statement was too lengthy, and that it should be reserved for oral presentation at the hearing. Milstead accepted this advice, and submitted a shorter grievance which merely stated that he was entitled to regular employee status based upon the total number of days which he had worked. As authority, Milstead cited § 41(a) of the Local Cartage Agreement. See n. 2, *supra*.

rance of the fact was attributable to Milstead's failure to inform him prior to the meeting. There was, however, some uncertainty regarding the currency of the Air Freight Agreement (which presumably contained the separate seniority provision). The Joint Committee thus decided to render a conditional decision which affirmed the grievance if the Company were unable to establish the currency of the Air Freight Agreement. Shortly thereafter, a Company representative delivered to Brown a copy of the Air Freight Agreement. Brown reviewed the document with Milstead but apparently did not notice the absence of language pertaining to the establishment of separate seniority listings. Brown then referred Milstead to another employer.

With these facts as a background, we now address the district court's denial of the Union's motion for a directed verdict. In considering a motion for a directed verdict under Rule 50(a), the trial court "must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury." *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir. 1975). As applied in this context, "sufficient evidence" is such that, when viewed in the light of those inferences most favorable to the nonmovant, *Galloway v. U. S.*, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943), and *Dowdell v. U. S. Industries*, 495 F.2d 641, 643 (6th Cir. 1974), there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ. *Sulmeyer v. Coca-Cola Co.*, 515 F.2d 835, 841 (5th Cir. 1975), *cert. denied* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976), *citing* 5A Moore's Federal Practice ¶ 50.02[1] (2d ed. 1974). Appellate courts apply this same standard. *O'Neill v. Kiledjian, supra* at 513, *citing* 9 Wright & Miller, Federal Practice and Procedure § 2524, at 542 (1971).

Milstead contended that the Union should have thoroughly scrutinized the Air Freight Agreement to determine whether there was any provision which authorized the maintenance of separate seniority listings. Since we conclude that there was sufficient evidence upon which this allegation could be submitted to the jury, it is unnecessary to reach the merits of other issues raised by counsel.

█ "The undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909–910, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964). A breach of that duty occurs only when a union's conduct toward an individual member is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes, supra*, 386 U.S. at 177, 87 S.Ct. at 910. Bad faith is not, however, a necessary element of proof when alleging arbitrary or discriminatory conduct by a union. *Ruzicka v. General Motors Corp.*, 523 F.2d 306, 310 (6th Cir. 1975). In some instances, it is necessary to show only that the union has processed a grievance in a perfunctory fashion. *Vaca v. Sipes, supra*, 386 U.S. at 194, 87 S.Ct. at 903; *St. Clair v. Local 515*, 422 F.2d 128, 130 (6th Cir. 1969). Certainly the duty of fair representation may be breached whenever a union ineptly handles a grievance because it is ignorant of those contract provisions having a direct bearing on the case.

█ In the case before us, it appears that there was more than sufficient evidence presented at trial which tended to show that the Union's duty was not fulfilled. Union business agent Sherman Brown testified that he was unable to counter the Joint Committee's challenge to Milstead's seniority claim because Milstead had failed to inform him about his work on Air Freight and Local Cartage routes. But the record shows that Milstead discussed his grievance with Union representative Homer Coomer at some time prior to the June 12 meeting of the Joint Committee, and in that discussion Milstead asked Coomer for advice regarding the submission of a lengthy grievance statement he had prepared. Coomer read the statement which mentioned Mil-

stead's work on Air Freight and Local Cartage routes. From this, the jury could have inferred that the Union was placed on notice as to Milstead's problem with the separate seniority provision (presumed to have been contained in the Air Freight Agreement) but that, in spite of this notice, the Union failed to check the applicability of the provision in preparing for the grievance hearing.

The Union also contended that the separate seniority system was in effect since it had informally reached agreement with the Company on the matter. But when the Joint Committee rendered its conditional opinion on the Milstead grievance, its decision was to affirm the grievance unless the Company could show that the Air Freight Agreement was in effect. The obvious purpose behind this requirement was to verify the existence of the separate seniority agreement which would have barred Milstead's claim to regular employee status. Thus, if an informal agreement did exist, the record does not show that anyone on the Joint Committee knew about it. Also, the jury could have inferred that Brown was unaware of any such agreement since he did not mention it when the challenge to Milstead's claim was presented.

After receiving a copy of the Air Freight Agreement from a Company representative, Brown reviewed its contents but failed to notice that the oftquoted seniority provision was missing. If Brown was not aware of the informal agreement, he may have been remiss in not noticing the absence of the seniority provision from the Air Freight Agreement. If, on the other hand, he was aware of the informal agreement, he may have breached his duty by failing to inform Milstead or the Joint Committee of it.

■ However, this does not necessarily imply that the Union was required to argue the absence of the seniority provision in Milstead's behalf. The Union could have refrained from arguing the point in deference to larger Union interests. As stated by the Court of Appeals for the Fifth Circuit,

The major goal of the duty of fair representation is to identify and protect individual expectations as far as possible without undermining collective interests. Where the individual and collective group interests clash, the former must yield to the latter. Where collective bargaining agreements are executed, there may be many provisions which lead individual employees to believe they are entitled to specified benefits but, in the final analysis, the collective group interests must remain paramount. *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 956–957 (5th Cir. 1976).[7]

In this case, no analysis of competing collective and individual interests could have occurred because the Union was seemingly unaware of Milstead's interest in the missing seniority provision.

■ With regard to the issue of damages, there is nothing in the record to support the $20,000 award assessed against the Union. In overruling Milstead's motion for attorney fees after the trial, the district court may have surmised that the jury would include within its verdict a sum representing a reasonable attorney's fee. As in *Scott v. Anchor Motor Freight*, 496 F.2d 276, 282 (6th Cir. 1974), *cert. denied* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974),

[t]he difficulty is that the jurors were presented with no evidence of what attorney fees were in this case, though their charge comprehended determining an amount of attorney fees. . . . The $12,500 verdict against the Union necessarily rests on a sheerly speculative foundation and cannot stand.

It is also possible that the award rendered here included some damages for lost wages. If so, the award is clearly contrary to law since judgment against the Union under the facts of this case can be had only for those damages that flowed from its own conduct, *Vaca v. Sipes, supra,* 386 U.S. at 196–198, 87

7. *Accord, Vaca v. Sipes, supra,* and *Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

S.Ct. at 919–921, and *Czosek v. O'Mara*, 397 U.S. 25, 29, 90 S.Ct. 770, 773, 25 L.Ed.2d 21 (1970), and which compensate Milstead "from the Union's pocket for those expenses he incurred because of the Union's failure to process his grievance properly." *Ruzicka v. General Motors Corp., supra* at 312.

The judgment of the District Court determining liability of the Union for breaching its duty of fair representation is affirmed, but the judgment is vacated as to the award of damages. The cause is remanded to the District Court for determination of damages incurred by plaintiff as a proximate result of the Union's breach of its duty of fair representation, including any attorney's fees incurred as a result thereof, and said determination to be consistent with our opinion.