Jerome A. MARENTETTE,
Plaintiff–Appellant,

v.

LOCAL 174, UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, and Federal Screw Works, Defendants–Appellees.

No. 89–1664.

United States Court of Appeals,
Sixth Circuit.

Argued April 3, 1990.
Decided July 3, 1990.

Harold Dunne (argued), Livonia, Mich., for plaintiff-appellant.

Chui Karega, Detroit, Mich., for Local 174, United Auto. Aerospace and Agricultural Workers of America.

Frank S. Galgan (argued), Troy, Mich., for Federal Screw Works.

Before KRUPANSKY and MILBURN, Circuit Judges, and THOMAS, Senior District Judge *.

WILLIAM K. THOMAS, Senior District Judge.

In a hybrid Labor Management Relations Act, Section 301 action, plaintiff-appellant Jerome Marentette (hereafter, plaintiff or Marentette) sues his employer Federal Screw Works (FSW) for breach of its collective bargaining agreement (CBA) with Local 174, United Automobile Aerospace and Agricultural Workers of America (Local 174).[1] In the same action, Marentette sued co-defendant Local 174 for breach of its duty of fair representation. At the center of his action is FSW's denial of plaintiff's grievance that he should have been classified a journeyman millwright when he returned to FSW employment after a leave of absence. Local 174 refused to carry the grievance to the fourth step. On separate motions of FSW and Local 174, the district court granted summary judgment for each defendant; and Marentette appeals. For the reasons stated, we affirm.

FSW is engaged in the business of manufacturing fasteners for the auto industry and operates a nut forming plant and a heat treating plant in Romulus, Michigan. Hired by FSW on June 4, 1962 in a laborer classification, Marentette, on March 4, 1968, was transferred to the skilled trades classification as a millwright trainee.

In September of 1971, according to Marentette, the company asked him if he was willing to "relinquish my right to go back into production and if so, would give me one hundred percent pay rate or journeyman status." The company "Rate Card" shows entries on 9–4–71 of "Millwright–Top–Rate" and "O.K. top rate," under the heading "Job Classification." An entry of March 6, 1972, when he received an increase in his rate, shows "top rate millwright" under the heading "Job Classification."

On April 3, 1972, Marentette took an indefinite leave of absence from FSW. He went to work for Local 174 as its business agent. As business agent, he serviced the collective bargaining agreement between defendant FSW and defendant Local 174. Additionally, he negotiated the 1974 FSW/Local 174 collective bargaining agreement.

Marentette served approximately 13 years as business agent of Local 174, but was terminated in a change of administrations. On April 15, 1985 plaintiff returned to his employment with defendant FSW. Marentette requested that he be returned to the millwright classification. He did so under the provision of the CBA that allows an employee "returning from sick leave or leave of absence or vacation [to] be returned to the same job he held prior to such leave."

When FSW assigned him to the classification of "Bench Inspector," Local 174 filed a grievance for him on April 22, 1985. The grievance stated

---

* Honorable William K. Thomas, United States Senior District Judge for the Northern District of Ohio, sitting by designation.

1. The language herein quoted from the CBA, effective January 11, 1977, is identical to the CBA effective in 1971 (in which relevant events occurred) and is controlling here.

This is a violation of EXHIBIT "D" in the labor agreement and his seniority rights as he has held the classification of "MILLWRIGHT" since 3/4/68.

FSW denied the grievance.

Exhibit "D," which in the grievance Marentette and Local 174 claim to have been violated, is attached to the 1971, 1974 and 1977 collective bargaining agreements. With the exception of a typographical error, Exhibit "D" to the contract of January 17, 1977, included in the joint appendix, is identical to Exhibit "D" attached to the 1971 contract which was in effect when Marentette claims to have achieved contractual journeyman millwright status. Exhibit "D" is entitled "Skilled Trades Trainee Program Agreement." The Agreement consists of seven sections: Section 1, Scope of Training Program; Section 2, Trainee Selection; Section 3, Wages; Section 4, Seniority; Section 5, Overtime; Section 6, Tools; Section 7, General.

## I.

While plaintiff's claim focuses on the last paragraph of Section 3 [2], the full text of the section is essential to understand how a skilled trades trainee progresses to. journeyman status:

Section 3. Wages

Trainees who are selected from the current work force shall be compensated according to the following rate schedule:

1st 6 Month Period—

The Trainee shall start at a rate equivalent to 73% of the maximum of the prevailing base wage rate for the Journeyman's classification for which he is training.

2nd 6 Months............76%
3rd 6 Months...........79%
4th 6 Months...........82%
5th 6 Months...........85%
6th 6 Months...........88%
7th 6 Months...........91%
8th 6 Months...........94%
9th 6 Months...........97%
10th 6 Months..........99%

At the option of each individual Trainee who has been upgraded from the existing work force, at the end of the fifth year of his participation in the Trainee Program he may choose to waive any rights he has to exercise seniority in the Production departments and to progress to the top of Journeyman's classification for which he is training by the end of the 6th year; or, the Trainee may choose to remain at the 99% rate schedule until completing his 8th year of apprenticeship and during this period retain the privilege of exercising his seniority in the Production departments in event of layoff.

Trainees will be assigned to a specific Journeyman for a six-month minimum period, during which time the Journeyman will assist in teaching the Trainee in the trade for which the Journeyman will be paid a supplement of sixty cents (60¢) per hour. The six-month period will be maintained, except for the emergency situations, so long as the Journeyman is doing an adequate training job to the Company's satisfaction.

The Company shall have the right to grant wage increases at a faster rate than spelled out above, if merited in the Company's judgment as to the progress of any individual Trainee hereunder.

2. Section 4, Seniority, which plaintiff also cites in support of his claim, reads:

**Section 4. Seniority**

Trainees shall retain their Master Seniority for all fringe benefits. During the training period the Trainee shall exercise his Trainee seniority only in the Trainee group.

In the event of layoff or disqualification from the Trainee Program the Trainee may exercise his Master Seniority rights to bump back into the Production departments.

Once a Trainee has attained Journeyman's status or elects to waive his bumping privilege at the end of the fifth year of the program in accordance with the wage agreement, he may no longer exercise any seniority rights in the Production departments.

In the event the Trainee waives his production seniority at the end of the fifth year his seniority shall be confined to the Trainee group only for all purposes except shift preference.

Upon acquiring Journeyman status, the employee's Skilled Trades seniority shall be as of date of entry into the skilled Trades Trainee Program and in no event shall his Master Seniority be exercised in the Skilled Trades departments.

Asked what period of time he was a trainee under the terms of Exhibit "D," Marentette answered, "From March 4th of '68 to September of '71." As to what then happened, he stated

> The company approached me and asked me if I was willing to relinquish my right to go back into production and if so, would give me one hundred percent pay rate or journeyman status.

After giving the names of two company employees who told him that, Marentette was asked in his deposition "[w]here in Exhibit D is this change that you are discussing provided for?" He answered

> Exhibit D gives the company the right to propel someone faster than the above progressions [referring to the table in Section 3].

From this answer it becomes evident that Marentette is dwelling on the last paragraph of Section 3, which reads

> The Company shall have the right to grant wage increases at a faster rate than spelled out above, if merited in the Company's judgment as to the progress of any individual Trainee hereunder.

In paragraph seven of his Complaint, Mr. Marentette states that at the time he was placed on Union leave of absence he was a contractual journeyman millwright. Marentette reiterates in other deposition testimony that he relies solely on the last paragraph of Section 3 in claiming that, by its September 1971 action, the company made him a contractual journeyman millwright

Q So you state that pursuant to Section 3 of Exhibit D, you became what, no longer a trainee?

A That's correct.

Q Under this language?

A Well, yes, that was the only language we had.

Q And this language, if I understand your testimony correctly, specifically provides that at the option of each individual trainee, beginning at the top of page eighty-four, at the option of each individual trainee who has been upgraded from the existing force at the end of the fifth year of his participation in the training program, he

may choose to waive any right he has to exercise seniority in the production departments and to progress to the top rates of the journeyman's classification for which he is training by the end of the sixth year.

Your testimony is that within less than that five-year period, you were moved to the top rate of the journeyman's classification, correct?

A Correct.

Q And that was pursuant to the subsequently occurring provision that states that the company shall have the right to grant wage increases at a faster rate than spelled out above if merited in the company's judgment as to the progress of any individual trainee hereunder.

A Certainly.

Q The events that occurred in September of '71, that you described, took place solely under the terms of this agreement, correct?

A That was the only agreement we had.

Q That was my next question. There was no other agreement, there was no side deal, there was no letter of understanding or any other agreement of any kind that you are aware of; is that correct?

A Not to my knowledge.

Contemporaneously with FSW's rejection of Marentette's grievance at the third step, Roy Melton, servicing representative for Local 174, received a letter from John M. Uram, Chairman, and Ken Golden, Recording Secretary, of the Local 174 committee. They wrote

> On behalf of the Skilled Trade employees, especially the Millwrights, the Committee would appreciate your cooperation with the investigation of Jerome Marentette's journeymans card.

Thereupon, Mr. Melton took up this matter with the Skilled Trades Department, UAW International, Solidarity House. In principal part, Melton's letter stated

> The problem appears that Jerome Marentette did not have the eight years as a Millwright Trainee as indicated in the

letter from Federal Screw dated August 25, 1977. Jerome was on staff as a full time representative at UAW Local 174 from April 3, 1972 until April 22, 1985 when he returned to Federal Screw as a Bench Inspector.

If indeed Jerome used false information to gain his Journeymans card, I request that appropriate action be taken to correct the problem, as this may lead to another Journeyman at Federal Screw being laid-off with twelve years in the trade.

I am enclosing copies of his Journeymans card, two letters from Federal Screw, and the letter from the Committee at Federal Screw.

Charles Stewart, International Representative UAW Skilled Trades Department, in an October 15, 1985 letter, informed "Brother Marentette" that "we have reviewed two work letters from Federal Screw Works dated August 25, 1977, and September 4, 1985." Mr. Stewart then wrote Mr. Marentette

Based on the Federal Screw letter dated September 4, 1985, we have determined that our 11/1/77 decision to issue you a UAW journeyman card for the Millwright trade was in error. We can only assume that the committee who reviewed your journeyman card application, and the Federal Screw letter dated August 25, 1977, were under the assumption that you had worked in the Millwright trade continually from March 1, 1968 to August 25, 1977.

From a review of the Federal Screw letter dated Sept. 4, 1985, it is clear that you only worked at the Millwright trade from March 1, 1968, until the date you went on leave of absence April 3, 1972. We cannot grant you credit for the time spent on leave of absence.

Mr. Stewart then informed Mr. Marentette

Unless you can provide us with documentation that you have eight or more years of experience at the Millwright trade, we will have no alternative except to ask that you return your journeyman card to our office.

Please advise me of any additional Millwright experience you may have.

In an affidavit of March 29, 1989, Roy Melton states that he spoke with Charlie Stewart and "learned that no documentation was submitted in response to the [Stewart] letter of October 15, 1985." Mr. Melton further states in the last paragraph of his affidavit

7. On or about November 11, 1985, at a meeting regarding the grievance of Plaintiff's classification the bargaining committee determined, after careful consideration, that Plaintiff's grievance lacked merit. This determination was based a substantial part on the information set forth at the October 15, 1985 letter of CHARLIE STEWART, and the lack of any documentation requested in that letter. Since Plaintiff was not a Journeyman, he was properly classified as trainee upon his return to the Federal Screw Works plant in April, 1985.

In a letter dated November 12, 1985, the day after its November 11, 1985 meeting, the FSW UAW Local 174 committee wrote "Brother Marentette,"

After considerable investigation your grievance 8610 and 8611 were found to be without merit in the step 4 Grievance meeting with the company on November 1, 1985.

Before he swore to the affidavit of March 29, 1989, servicing representative Melton, on November 30, 1988, testified in a deposition that he had withdrawn the Marentette grievance. Asked his basis, Melton said he had "found that [Marentette's] grievance was without merit." Melton then testified

He alleged violation of Exhibit D. After my investigation, I found that was not true.

While this basis for denying the grievance is not mentioned in the Melton affidavit, it does not contradict the affidavit statement that "[t]his determination [that the grievance lacked merit] was based a *substantial part* on the information set forth at the October 15, 1985 letter of CHARLIE STEWART, and the lack of any documenta-

tion requested in that letter." (Emphasis added.)

Mr. Melton admitted that he did not talk to Mr. Marentette before he withdrew the grievance. He was then asked "Then you don't know of your own personal knowledge what Mr. Marentette's position was?" Mr. Melton answered

He sent a letter to me spelling out different things. I don't recall what they were; that was the extent of it.

After the rejection of his grievance, plaintiff filed a charge under Section 8 of the National Labor Relations Act, as amended. The Detroit Regional Director, by letter of November 26, 1985, notified Mr. Marentette that "because there is insufficient evidence of violation, further proceedings are not warranted at this time."

Through the internal appeal procedure of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America ("UAW"), Marentette appealed the actions of defendant Local Union. UAW International President Bieber wrote plaintiff on October 12, 1987

You were notified of the grievance settlement on November 12, 1985, and you did not file a Constitutional appeal of the disposition reached until April 20, 1986. The April 20, 1986 request to appeal a November 26, 1985 disposition was untimely.

You have indicated that mental frustration was present which may have caused the delay of appeal; nonetheless, a complaint on the subject matter was filed with the National Labor Relations Board earlier. On the other hand, there was no evidence submitted to substantiate a claim that you were mentally incapable of availing yourself to the Constitutional Appeals procedure when the final disposition was reached.

In view of the above, we have no alternative but to deny your request for further appeal on the basis of untimeliness alone. Accordingly, and pursuant to Article 33, Section 4(b) and (c) of the Constitution of the International Union, UAW, the issue is closed.

Thereafter, on March 13, 1988, Mr. Marentette filed this action. Claiming his action arises under the Labor Management Relations Act, Section 301 (as amended); Title 29 U.S.C. § 185 (1947), Mr. Marentette asserts two counts. Count I states

21. In withdrawing plaintiff's grievance, Defendant Union breached its duty of fair representation.

22. Defendant Union acted in an arbitrary, capricious, discriminatory, and bad faith manner.

Count II states

25. By not returning plaintiff to the skilled trades classification of Millwright, Defendant Employer violated plaintiff's contractual rights.

## II.

### A.

In his complaint, plaintiff states that "[a]t the time plaintiff was placed on a union leave of absence plaintiff was a contractual journeyman Millwright." As seen, plaintiff bases his claim on the fact that in September 1971, while he was a trainee, he accepted the company's offer to waive his right to go back to production in exchange for "100 percent pay rate or journeyman status." Plaintiff says the company acted under the last paragraph of Section 3 "Wages" which authorizes it "to grant wage increases at a faster rate than spelled out above [see table, *supra* at 605], if merited in the Company's judgment as to the progress of any individual Trainee hereunder."

The task of the district court was to decide whether any language in Exhibit D of the CBA expressly or impliedly supports the plaintiff's claim of being a "contractual journeyman Millwright." Referring to the final provision of Section 3, on which the plaintiff relies, the district court observed in its grant of summary judgment

The plaintiff's rights, whatever they may be, then are governed by further provision of Section 3 and by Section 4. It's the contention of Plaintiff that he became a journeyman under a further provision under the last paragraph of

Section 3 because he was paid a journeyman's rate. That provision states that the company shall have the right to grant wage increases at a faster rate than spelled out above.

The district court then found

Well, the company has that option, but there's no language that in the Court's estimation can be interpreted to mean that the employee becomes a journeyman because the company elects to accelerate his progress as far as the pay scale is concerned. I think that the agreement is not susceptible of that sort of an interpretation.

The court then proceeded to examine Section 4

I might mention that under section 4 there is language regarding the attainment of journeyman status, and under Section 4 we find this language:

"Once a trainee has attained journeyman status or elects to waive his bumping privilege at the end of the fifth year [of the program in accordance with the wage agreement], he may no longer exercise [any] seniority rights [in the production departments]."

There again, that seems to be an indication that if you proceed under one of these other provisions, you're not a journeyman. The trainee can either attain journeyman status or he may elect to waive bumping privileges and so forth and so on, but certainly there's no indication under that language that he attains journeyman status. He merely elects to receive a higher pay rate in exchange for giving up some seniority rights.

The district court then determined plaintiff's breach of contract claim against FSW

It seems to the Court that the language of the contract is not susceptible of any other interpretation, and it's the Court's ruling that by merely being paid at a journeyman's pay rate, the plaintiff does not become a journeyman.

Plaintiff argues

A Trainee can become a journeyman, under the above quoted Trainee Program, *in one of three ways*, which are:

1. Waiving his seniority rights to return to the Production Departments at the end of his fifth year of training; and then *"to progress to the top of Journeyman's classification for which he is training by the end of the 6th year."*

2. *Remain at the 99% rate schedule until completing his 8th year of apprenticeship;* and "during this period retain the privilege of exercising his seniority in the production departments in event of layoff."

3. *The company shall have the right to grant wage increases at a faster rate than spelled out above, if merited in the Company's judgment as to the progress of any individual Trainee.*

Since the plaintiff's claim is based solely on his third "way" this third "way" will be first examined. The third "way," as seen, merely copies the verbatim language of the final paragraph of Section 3. The plaintiff does not quote any other language in either Section 3 Wages or Section 4 Seniority to support his claim. This is clear from the following deposition colloquy. As to Section 3 Wages, and Section 4 Seniority, the plaintiff, Mr. Marentette, was asked

Q. In both paragraphs that I have read, it says at the end of the fifth year. Can you tell me how it is that you don't have to be at the end of your fifth year?

He answered

A. The Company chose to grant the increases contractually and brought these people up to the hundred percent.

When the Union counsel asked him, "and that relates solely and only to the pay increase, does it not?", Mr. Marentette answered "No it does not." Then, he was asked

Q. Show me where it says anything about status classification, journeyman, trainee or otherwise. Can you show us that in the literal text of the provision?

Mr. Marentette responded

A. I don't believe there is any specific language that says if you are at one

hundred percent, you are in fact a journeyman.

Thus, plaintiff concedes that his term "contractual journeyman Millwright" does not rest on any "specific language" of the agreement. Instead, he says the company creates this journeyman status when it exercises its right under the last paragraph of Section 3 to "grant wage increases at a faster rate." A raise to a trainee of 100 percent of millwright rate, he says, acts to make the trainee a journeyman millwright. Since Section 3 does not bestow such authority on the company, it could not make Marentette a journeyman millwright.

Plaintiff asserts he is supported in his claim of "contractual journeyman Millwright" status by two entries on his "Rate Card." Plaintiff notes that the "Rate Card" lists him as a "Millwright Trainee" on 3/4/71, but "[o]n his next Rate Card entry *the word Trainee* was dropped and plaintiff was listed as 'Millwright–Top–Rate.'" This argument assumes that under the "Skilled Trades Trainee Program Agreement," FSW is empowered to vest journeyman millwright status on a trainee. Yet, as plaintiff testifies, there is no "specific language that says if you are at one hundred percent, you are in fact a journeyman." Thus, it is circular to reason that because the "Rate Card" on 9/4/71 reads "Millwright–Top–Rate," and on 3/6/72 reads "top rate millwright," that he thereby achieved the status of journeyman millwright. As the district judge correctly held, "by merely being paid at a journeyman's pay rate, the plaintiff does not become a journeyman."

■ While the plaintiff's four years as a trainee would not qualify him as a journeyman millwright under his asserted first "way," it is essential to examine his first "way"

1. Waiving his seniority rights to return to the Production Departments at the end of his fifth year of training; and then *"to progress to the top of Journeyman's classification for which he is training by the end of the 6th year."*

See supra at 609. A pertinent part of Section 3 Wages nullifies this asserted first "way" to become a journeyman millwright. It reads

At the option of each individual Trainee who has been upgraded from the existing work force, at the end of the fifth year of his participation in the Trainee Program he may choose to waive any rights he has to exercise seniority in the Production departments and to progress to the top [rate [3]] of Journeyman's classification for which he is training by the end of the 6th year; or, the Trainee may choose to remain at the 99% rate schedule until completing his 8th year of apprenticeship and during this period retain the privilege of exercising his seniority in the Production departments in event of layoff.

This language expressly permits a trainee to obtain "the top rate of Journeyman's classification ... by the end of the 6th year." But, he does not thereby become a journeyman. Indeed, the next to the last paragraph of Section 4 Seniority concerns the seniority of any "Trainee [who] waives his production seniority at the end of the fifth year," necessarily including trainees with six or more years. Section 4 states their "seniority shall be confined to the trainee group only for all purposes except shift preference." Since Trainees with six or more years remain part of the "trainee group," it is manifest that at the end of six years a trainee does not achieve journeyman status. Moreover, such six years to become a journeyman would be incompatible with the eight years of apprenticeship needed to become a journeyman required in the last clause of the second paragraph of Section 3 (this is the plaintiff's second "way"), which provides

or, the Trainee may choose to remain at the 99% rate schedule until completing his 8th year of apprenticeship and during this period retain the privilege of exercis-

---

**3.** The typographical error referred to *supra* at 605, is the omission of the word "rate" from "Exhibit D" to the 1977 CBA as the result of a printing error. The word "rate" does appear in the 1971 CBA.

ing his seniority in the Production departments in event of layoff.

■ At oral argument, plaintiff's counsel contended that the case should be reversed and remanded to permit the receipt of parol evidence. The plaintiff says the term "Journeyman" is ambiguous, and surrounding circumstances or other extrinsic evidence should be considered in determining the meaning of "Journeyman" as used in the "Skilled Trades Trainee Program Agreement." [4] While the term journeyman is not defined in the CBA, it is determined that the term, as used, is not ambiguous.

The capitalized term "Journeyman" appears nine times in the Skilled Trades Trainee Program Agreement Exhibit D to Contract of January 11, 1977. The term's meaning becomes apparent from its use in the final paragraph of Section 7 General, which concludes Exhibit D

> Nothing contained herein shall be construed to limit the Company's right to hire Journeymen at any time to fill such vacancies as may exist in its Skilled Trades classifications, nor shall the Company be required to place Trainees on the job prior to hiring of such Journeymen.

The company's reserved right to hire journeymen off the street implies a use of the term that has a meaning that is not dependent on the earlier paragraphs of Exhibit D. As part of a collective bargaining agreement between an employer and a UAW Local Union, it is concluded, absent some different contractual definition in the Local's CBA, that the term is used with a meaning that coincides with the UAW International Constitution which requires

eight years of apprenticeship to achieve journeyman status in the skilled trades.[5]

This conclusion is reinforced by Mr. Marentette's testimony on how one becomes a journeyman under the International Constitution. As Local 174's business agent for 13 years, he had the opportunity to become familiar with the International Constitution and the UAW's practices. He was asked, "[T]o get a journeyman's card, what do you have to do?" He answered

> A. There is a standard application form that you have to fill out and you take that to the Solidarity House with proof of employment in the trade and time in the trade.
>
> Q. What time in the trade is required?
>
> A. To obtain a journeyman's card with the International, eight years is required unless you are on a bona fide apprenticeship, then it's four.

Plaintiff agrees that eight years experience under the UAW Constitution are needed for journeyman status and that the FSW Skilled Trades Trainee Program is not a bona fide apprenticeship. Therefore, Marentette's four years as a skilled trades trainee do not qualify him as a journeyman. Plaintiff correctly states that the CBA does not expressly require that a journeyman millwright obtain a journeyman's card from the International to qualify as a journeyman at FSW. Nevertheless, the CBA (Section 3 of the Skilled Trades Agreement) does demonstrate a congruence between the bona fide apprenticeship of eight years, required in the International Union's Constitution, and Exhibit D, Section 3 Wages, which provides that a trainee "may choose

---

**4.** 17 Am.Jur.2d, Contracts § 273 makes it clear that surrounding circumstances may be considered in determining the meaning of a contract and the intention of the parties thereto, as of the time of entering into the contract, in "cases where resort to such circumstances is made necessary by reason of the ambiguity and uncertainty of the contract language...." The parol evidence rule does not apply where the language of a written agreement is plain and not susceptible of more than one meaning.

**5.** Questioning this statement in the majority opinion, the dissent asserts at p. 1: "However, the UAW International Constitution is not in the record." This is true, but immaterial, in light of

Marentette's admission that the International Constitution requires eight years of experience in the trades,

> Q You didn't have eight years of experience in the trades, did you?
> A Not on-the-job experience, no.
> Q And you didn't have eight thousand hours in any approved skilled trades program, did you?
> A No.
> Q So by the literal terms of the UAW requirement, you didn't meet the requirements, did you?
> A To the terms of the International constitution, I did not meet the terms.

to remain at the 99% rate schedule until completing his 8th year of apprenticeship."

Plaintiff relies on several letters and memoranda from UAW representatives to support his claim that he is a "contractual journeyman Millwright." On July 30, 1987 John Rucker, International Representative Region 1A, provided Charles Stewart and Frank Fish of the UAW Skilled Trades Department with a copy of the "Skilled Trades Trainee Upgrader Agreement" (FSW and Local 174) "and other documentation involved in Brother Marentette's appeal." Rucker asked them to review the documents and advise him "if [they] concur with [his] interpretation." [6] He stated, "I believe Marentette is a contractual journeyman millwright at the Federal Screw Works Unit of Local Union 174, UAW." They responded "we have reviewed the documentation enclosed with your memo and concur with your interpretation...."

 The determination as to whether or not a contract is ambiguous is a decision for the court to make. *Local 783, Allied Industrial Workers of America, AFL–CIO v. General Electric Corp.*, 471 F.2d 751, 757 (6th Cir.1973), *cert. denied*, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973). This court held, *supra* at 610–611, that the language in Exhibit D to the collective bargaining agreement is clear and unambiguous. Likewise, the interpretation of an unambiguous contract is a matter of law for the court, and a party's interpretation is not permissible evidence. *Kassin v. Arc–Mation, Inc.*, 94 Mich.App. 520, 288 N.W.2d 413 (1979). Moreover, the International Union was not a party to the collective bargaining agreement, and International Representatives Rucker, Stewart and Fish had no part in the negotiation of the FSW–Local 174 "Skilled Trades Trainee Program Agreement." Thus, in any event, their "interpretations" are plainly not admissible. *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 & n. 11 (9th Cir.1980).

Notwithstanding, item (e) of the items of "facts" listed in Rucker's letter deserves discussion. Rucker states

> Employees who were in the Training Program at the same period as Marentette are now considered as Journeymen and are working as millwrights.

While this statement would not be admissible evidence, Mr. Marentette's testimony on this subject may be admissible evidence. Marentette was interrogated by Local 174's counsel

> Q At the time this offer was made to you, do you know if the same offer was made to anyone else in the plant?
>
> A Not at the same time it wasn't. It has been made to several others.
>
> Q Since then you mean?
>
> A Yes.

---

**6.** In principal part, Rucker's "Inter–Office Communication" states

> Based on the language contained in the Training Agreement, the union leave of absence provision of the contract and the following facts, I believe Marentette is a contractual journeyman millwright at the Federal Screw Works Unit of Local Union 174, UAW. The facts show the following:
>
> (a) He went into the Training Program on March 4, 1968.
>
> (b) He was permitted to waive any rights to go back to production and was granted 100% of the journeyman millwright's rate on September 4, 1971.
>
> (c) He went on full-time union leave on April 3, 1972.
>
> (d) The leave of absence language provides that his seniority rights will not be affected due to a full-time union leave.
>
> (e) Employees who were in the Training Program at the same period as Marentette are

> now considered as journeymen and are working as millwrights.
>
> (f) A company seniority printout, effective February 6, 1987, lists Marentette as having a seniority date of June 4, 1962 with a skilled trades date of entry seniority of March 4, 1968.
>
> (g) The Training Agreement provides that employees will be given a skilled trades date of entry seniority upon acquiring journeyman status.
>
> (h) There is no definition of journeyman status in the Agreement.
>
> On August 6, 1987 Frank Fish and Charles Stewart, International Representatives, wrote back
>
> As per your request, we have reviewed the documentation enclosed with your memo and concur with your interpretation that Brother Marentette is a contractual journeyman millwright under the provisions of the Federal Screw Works, UAW Local 174 agreement.

Q Who were the others that have done that since then?

A It was made to a plumber named John Ball, Chuck Hurworth, the millwright, Joe Marko, the electrician, and Ray Beyer, a millwright.

Q Is that all you can think of?

A That's all I can think of now.

Questioned further as to the number of years when these employees were "given one hundred percent," Marentette answered that John Ball had "[l]ess than five"; Joe Marko was "asked prior to five years" and Ray Beyer "also was asked prior to five years." Chuck Hurworth, asked at 5 years, declined. Later, "Chuck Hurworth was asked to take the leader's job in the maintenance department and he accepted that and they gave him a hundred percent."

The company has not offered any evidence to explain or refute this testimony of Marentette. Yet, Marentette's testimony as to these four other FSW employees adds no new element to his testimony about his own case. He says each received 100% pay before the end of five years. Thus, it still comes back to whether, in exercising the power under Section 3, "to grant wage increases at a faster rate than spelled out above" the company thereby makes the employee a "contractual journeyman." Plaintiff insists

> Where it says one hundred percent. If you obtain one hundred percent of the pay rate, you are then a contractual journeyman.

But neither the last paragraph of Section 3, nor any other language of the "Skilled Trades Trainee Program Agreement," em-powers the company to create a "contractual journeyman millwright."

While the company, by the collective bargaining agreement, is not given the power to create a "contractual journeyman," it may be that the company and the Local Union could have agreed to a procedure to create a "contractual journeyman." At least, in *Page v. Curtiss–Wright Corporation,* 332 F.Supp. 1060 (D.N.J.1971), the collective bargaining agreement between the corporation and Local 669–UAW defined "journeyman" to include an employee known as a "Contractual Journeyman." *See id.,* at 1062 n. 3. It is enough to observe that the "Skilled Trades Trainee Program Agreement" between FSW and Local 174 makes no similar provision for a "contractual journeyman."

For the foregoing reasons, it is concluded that the district court properly granted FSW's Motion for Summary Judgment as to Count II of plaintiff's Complaint.

### B.

■ The district court also granted summary judgment on Count I against Local 174. In that count plaintiff asserts that the Local Union breached its duty of fair representation "[i]n withdrawing plaintiff's grievance."[7] In his deposition testimony, Marentette concedes that the union "took the position that [he] be returned to the classification [journeyman millwright] in support of the grievance...." Marentette acknowledges that the union maintained this position through the first three steps of the grievance procedure. When asked what happened at the fourth step of the

---

7. In *White v. Anchor Motor Freight, Inc.,* 899 F.2d 555 (6th Cir.1990), the Sixth Circuit Court of Appeals upheld a district court's direction of verdict in favor of the union on a duty of fair representation claim brought by appellant White, a union member. The Sixth Circuit stated

> Appellant's argument ... is advanced in the face of the established rule that the two constituent claims in every hybrid 301 action—breach of collective bargaining agreement and breach of a union's duty of repesentation—are interdependent; if the first claim anchored in the employer's alleged breach of

the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it.

*Id.* at 559 (footnote omitted). Applying this rule with regard to White's hybrid 301 claims, the court of appeals held that having denied plaintiff's 301 claim against the employer, the district court properly directed a verdict for the union on the breach of the duty of fair representation claim. *White v. Anchor Motor Freight,* pertinent here, forms the second basis for affirming the district court in granting summary judgment on plaintiff's count one.

grievance procedure, Marentette replied, "That was when the Union withdrew the grievance." Plaintiff Marentette was then asked, "Why did they withdraw it, to your knowledge?" Marentette answered, "I got a piece of paper that said [the union] withdrew it because it had no merit."

Before considering the circumstances under which Local 174 withdrew the grievance at the fourth step (arbitration was the next step), it is pertinent to cite the holding of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), regarding the "established" duty of fair representation to its members. *Vaca* says this about a local union's refusal to take a grievance to arbitration:

> Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or press it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement.... In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures....
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.
>
> . . . .
>
> [W]e conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration.

As seen, *supra* at 607, Roy Melton, Servicing Representative, states in his affidavit that, on November 11, 1985, the committee, at a meeting, determined that

> Plaintiff's grievance lacked merit. This determination was based a substantial part on the information set forth at the October 15, 1985 letter of CHARLIE STEWART, and the lack of any documentation requested in that letter. Since plaintiff was not a journeyman, he was properly classified as trainee upon his return to the Federal Screw Works plant in April, 1985.

Marentette's own deposition testimony reveals that he was well aware of the fact that he was not qualified to have a journeyman's card. Explaining how he obtained the card, Marentette testified

A I did not have eight years in the trade. When I applied for that journeyman's card, I was on leave of absence.

Q So how was it that you were issued a journeyman's card?

A The Federal Screw Works sent me a letter stating that my status with the company was that of millwright and had been since March 1968.

. . . .

Q But that doesn't count for getting a journeyman's card for any period that you were engaged in your position as Union Rep; is that correct?

A That's correct.

Q But you went ahead and applied for a journeyman's card anyways, knowing that?

A Yes, I did.

In essence, Marentette's own testimony amounts to a virtual admission that he fraudulently obtained a journeyman's card.

In his letter of September 12, 1985 requesting an investigation of Marentette's journeyman card, Roy Melton wrote to the Skilled Trades Department

> If indeed Jerome used false information to gain his Journeymans card, I request that appropriate action be taken to correct the problem, as this may lead to another Journeyman at Federal Screw

being laid-off with twelve years in the trade.

The local union learned that the Skilled Trades Department directed Marentette to "return [his] journeyman card to [its] office," failing his production of any documentation that he had "eight or more years of experience at the Millwright trade." Since he produced no such documentation, it was reasonable for the Local 174 committee to decide on November 11, 1985 to withdraw his grievance. That his fraudulently obtained journeyman card was the "substantial part" of the committee's determination is evidenced by the fact that it was the next day, November 12, 1985, that the committee informed him

> After considerable investigation your grievance 8610 and 8611 were found to be without merit in the step 4 Grievance meeting with the company on November 1, 1985.

Under the duty of fair representation doctrine, "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* at 177, 87 S.Ct. at 910 (citing *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370). Plaintiff charges Local 174 with "bad faith" in withdrawing his grievance at Step 4. The only "bad faith" apparent to this court is that of Marentette in fraudulently obtaining his journeyman card.

*Ruzicka v. General Motors Corporation*, 523 F.2d 306 (6th Cir.1975), following *Vaca v. Sipes*, holds that "arbitrary" and "discriminatory" treatment are separate and independent standards

> Union action which is arbitrary or discriminatory need not be motivated by bad faith to amount to unfair representation.

*Ruzicka*, 523 F.2d at 310. Plaintiff charges Local 174, in withdrawing his grievance at Step 4, was also acting arbitrarily and in a discriminatory manner. This charge is negated by the additional ground on which Roy Melton testified the grievance was withdrawn. He testified in his deposition

> He alleged violation of Exhibit D. After my investigation, I found that was not true.

In part II.A. it has been determined, as a matter of law, that the company did not violate the "Skilled Trades Trainee Program Agreement" when it refused to recognize Marentette as a journeyman on his return to employment from his union leave of absence. Thus, it was not arbitrary or discriminatory for Roy Melton to conclude that the "alleged violation of Exhibit D . . . was not true."

Hence, the district court did not err in concluding

> The UAW in addition prevails because there's no issue of fact or no facts have been admitted here to indicate in any way that the UAW has been guilty of any bad faith arbitrary conduct or discriminatory conduct.

The district court's granting of the summary judgment motions on counts I and II is AFFIRMED.

MILBURN, Circuit Judge, dissenting.

I respectfully dissent for the reasons that follow. In my view, the majority and the district court have erred in concluding that the word "Journeyman," as used in Exhibit D, has a known and controlling definition. The majority concedes that the term is not defined in the CBA, yet, it concludes that the term, as used, is clear and unambiguous. From FSW's retained right to fill vacancies with journeymen ahead of trainees, the majority concludes that "the term is used with a meaning that coincides with the UAW International Constitution which requires eight years of apprenticeship to achieve journeyman status in the skilled trades." However, the UAW International Constitution is not in the record.

The only direct evidence of UAW International standards is the testimony of the plaintiff that eight years in the trade is normally required to obtain a journeyman's

card. The majority recognizes that "the CBA does not expressly require that a journeyman millwright obtain a journeyman's card from the International to qualify as a journeyman at FSW."

In section 3, Exhibit D allows a trainee to "waive any rights ... to exercise seniority in the Production departments and to progress to the top of Journeyman's classification." Alternatively, he can retain seniority rights in the Production departments and "remain at the 99% rate schedule *until* completing his 8th year of apprenticeship...." J.A. 58–59. From this single mention of an eight-year period and its "congruence" with the eight-year period under UAW International standards, the majority rules out any genuine issue that one could be a journeyman at FSW before serving eight years as an apprentice. I am not convinced that the mere mention of an eight-year apprenticeship in one context establishes that the term journeyman, clearly and unambiguously in all contexts, means one who has eight years in the trade. I find the mere mention of an eight-year apprenticeship especially unconvincing in this case since the plaintiff had achieved 100% journeyman pay through merit increases and was, thus, not subject to the requirement that he "remain at the 99% rate schedule until completing his 8th year of apprenticeship."

As the majority recognizes, the record contains unrefuted testimony of Marentette that he and four others were given contractual journeyman status early when they were advanced to 100% of the journeyman pay rate. Marentette's claims are corroborated in part by his pay rate card which reflects a change in status on September 4, 1971, from "Millwright Trainee" to "Millwright–Top–Rate." J.A. 227. This status continued until Marentette's leave of absence began. *Id.*

The majority criticizes plaintiff's reliance upon the above evidence as employing circular reasoning. The majority reasons that since FSW did not have the authority to grant journeyman status, any proof that it had done so is irrelevant. In my view, the majority commits the same error it finds in

the plaintiff. The majority reasons that since the term journeyman is not defined in the CBA, the term must have the same meaning as given it in the UAW International Constitution (a document not in this record); therefore, the CBA defines journeyman in a way inconsistent with plaintiff's proof.

Because I believe that the language of the written agreement is ambiguous as to when a person is a millwright or a journeyman, as opposed to a trainee, I would find that the interpretation of the contract is a factual issue turning upon the intent of the parties. *Manley v. Plasti–Line, Inc.,* 808 F.2d 468, 471 (6th Cir.1987); *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1128–29 (6th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). Since the defendants failed to submit parol evidence to show that the contractual language had only one reasonable and intended meaning, I would conclude that summary judgment was not appropriate on the issue of plaintiff's right to reinstatement as a millwright. *See Manley,* 808 F.2d at 471 n. 5; *see also 60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987).

I would also hold that there was a genuine issue of material fact as to whether Local 174's handling of the grievance rose to the level of perfunctory handling. The majority devotes considerable discussion to the method by which Marentette obtained a journeyman card and to the Union's determination that he was not entitled to that card. Since I am not convinced that a journeyman card was essential to plaintiff's grievance under the terms of the CBA, I will address what I believe is the more critical issue.

In *Milstead v. International Bhd. of Teamsters, Local 957,* 580 F.2d 232 (6th Cir.1978), *cert. denied,* 454 U.S. 896, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981), we held that a union's failure to scrutinize a CBA to determine whether the presence or absence of any provision supported the grievant's position rose to the level of perfunctory handling and, therefore, breached the duty of fair representation. I am persuaded by *Milstead* that summary judgment was inappropriate in this case.

In *Milstead,* the grievant had driven trucks for one company on two separate routes covered by separate CBAs. *Id.* at 234. When the grievant began working, both agreements provided for separate seniority listings. Later, the agreement for one route was renegotiated, and the requirement of separate seniority listings was omitted. The grievant later tried to establish seniority on one route by applying his time on the other route. The union's failure to notice the omission in the later agreement and assert it on the grievant's behalf was a breach of the duty of fair representation. *Id.* at 235–36.

In this case, neither plaintiff's original grievance nor his complaint in the district court was based upon a right to reinstatement as a journeyman cardholder. Rather, plaintiff claimed a "violation of Exhibit 'D' in the labor agreement." Thus, Local 174's duty under *Milstead* was to examine Exhibit D of the CBA for a basis for the grievance rather than "presume" that the CBA required a journeyman card.

I find little in Local 174's affidavits and other proof to show that it fulfilled this duty. The affidavit of Roy Melton, an official of Local 174, stated that the dismissal of the grievance was based "in substantial part" upon the finding that plaintiff was not entitled to a journeyman card. Melton testified in a deposition that he was aware Marentette alleged a violation of Exhibit D. Melton added, "After my investigation, I found that was not true." J.A. 230. From the premise that FSW did not violate the Skilled Trades Trainee Program agreement when it refused to reinstate Marentette, the majority arrives at the conclusion that it was not arbitrary or discriminatory for Melton to conclude that the "alleged violation of Exhibit D ... was not true." I disagree with both the premise and the conclusion.

Had Local 174 carefully examined the CBA and other facts in this case, I believe it would have found possible merit in plain-

tiff's grievance. Neither FSW nor Local 174 can point to a document in this record which defines either millwright or journeyman. At the time plaintiff began his leave of absence, he received full journeyman pay and his pay rate card classified him as "Millwright–Top–Rate." In fact, although Local 174 withdrew the grievance on information from Charlie Stewart of the UAW International that plaintiff was not a journeyman millwright because he did not qualify for a journeyman card, J.A. 92, after the grievance was dismissed, Stewart reviewed the documentation and opined that "Brother Marentette [was] a contractual journeyman millwright under the provisions of the Federal Screw Works, UAW Local 174 agreement." [1] J.A. 84.

Given the state of the record and Local 174's continued emphasis upon plaintiff's failure to qualify for a journeyman card, I conclude that there was a genuine issue of material fact as to whether Local 174 merely presumed that the CBA required a journeyman card and failed to entertain the possibility that ambiguity in the CBA supported plaintiff's grievance.

Accordingly, for the reasons stated, I would reverse and remand for further proceedings.

---

1. The majority dismisses Stewart's statement as inadmissible expert opinion testimony regarding the proper interpretation of a contract. However, I believe that this testimony would be relevant to the shallowness of the inquiry by Melton and Local 174, and thus, with the proper limiting instruction, could be admitted.